**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

WALTER L. ANDERSON,

                         Plaintiff,           **REPORT AND RECOMMENDATION**

     -against-                             **12-CV-1055 (DLI) (ST)**

PHOENIX BEVERAGES, INC.,

                         Defendant.
-----------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

       Plaintiff Walter L. Anderson commenced litigation against his former employer, Phoenix

Beverages, Inc. ("Phoenix") in this District on February 27, 2012. Dkt. No. 1 (Complaint). Mr.

Anderson amended his complaint on March 25, 2013, to allege a hostile work environment,

employment discrimination based upon race, and retaliation for protected activities, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Dkt. No. 25 ("Am.

Compl." or the "Amended Complaint"). Following the completion of discovery, Phoenix moved

for summary judgment on all three claims on April 15, 2016. *See* Dkt. No. 81. On May 9, 2016,

Phoenix filed a motion for sanctions against Plaintiff. Dkt. No. 89. Chief Judge Dora L. Irizarry

referred Phoenix's motions to me for a Report and Recommendation on November 23, 2016.

Following the entry of an Order dated February 17, 2017, the parties filed supplemental briefing

on the summary judgment motion. Dkt. Nos. 99 & 101. For the following reasons, I respectfully

recommend that the motion for summary judgment be granted in part and denied in part and the

motion for sanctions be denied.

I.      **FACTUAL BACKGROUND**[1]

     A.      **Mr. Anderson's Employment Background and the 2004 CBA**

Plaintiff Walter L. Anderson, an African-American, worked for defendant Phoenix as a

forklift driver at a warehouse facility located in Long Island City, New York, from March 19,

1993 to November 8, 2008. Dkt. No. 84-1 (Affidavit of Walter L. Anderson) ("Anderson Aff."),

¶¶ 2, 3. While working for Phoenix, Mr. Anderson and other employees were represented by the

International Brotherhood of Teamsters. *See id.* ¶ 5. Mr. Anderson was first elected as shop

steward by the members of his bargaining unit, Teamsters Local 202, in 2002. *Id.* Mr. Anderson

served as shop steward in 2003, 2004, 2005, 2006, and 2008, whether for Teamsters Local 202

or its successor, Teamsters Local 812 (together, the "Union"). *Id.*

Throughout Mr. Anderson's employment with Phoenix, a collective bargaining

agreement ("CBA") covered the conduct of Phoenix's Union employees and labor relations. *Id.* ¶

7. The relevant CBA was entered into on January 5, 2004, and operative from November 16,

2003 through January 15, 2009. Dkt. No. 84-6 (CBA dated Jan. 5, 2004) (the "2004 CBA"),

pmbl. & art. 30. Under the 2004 CBA, the authority of shop stewards like Mr. Anderson was

limited to investigating and presenting grievances, collecting dues when authorized, and

transmitting messages and information authorized by the Union. *Id.*, art. 22. The 2004 CBA also

---

[1]      The Federal Rules of Civil Procedure provide that a party who asserts that a fact "cannot
be or is genuinely disputed must support the assertion by" either citing to materials on the record
or "showing that the materials cited do not establish the absence or presence of a genuine
dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.
Civ. P. 56(c)(1). When the summary judgment motion or opposition relies upon an affidavit or
declaration, it "must be made on personal knowledge, set out facts that would be admissible in
evidence, and show that the affiant or declarant is competent to testify on the matters stated."
Fed. R. Civ. P. 56(c)(4). If a party fails to properly address another party's assertion of fact, the
Court may, *inter alia*, "consider the fact undisputed for purposes of the motion," or "grant
summary judgment if the motion and supporting materials—including the facts considered
undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

provided that the shop steward has "no authority to take strike action, slowdowns, sick outs or any other action interrupting [Phoenix's] business," and Phoenix "shall have the authority to impose proper discipline, including discharge, in the event the [shop] steward has taken unauthorized strike action, slowdown, and sick out or work interference in violation of this [CBA]." *Id.* In addition, "strikes, slowdowns, sympathy strikes, sick outs, picketing or concerted refusal to work by the UNION or the employees in the bargaining unit" were not permitted on Phoenix's premises. *Id.*, art. 17. To the extent that Phoenix "discharge[d] any employee for dishonesty, drunkenness in the course of employment, criminal conduct, flagrant insubordination to a member of [Phoenix's] management, or gross negligence resulting in damage to [Phoenix's] property, and if the UNION disputes the employee's guilt of such an act or omission, the UNION may refer the dispute to arbitration as provided for in this [CBA]." *Id.*, art. 11.

The 2004 CBA also contained an arbitration clause, which provided that "[a]ll disputes" between Phoenix, the Union, and/or any employees must be "promptly taken up for adjustment by the UNION," and if adjustment failed, then "the matter may be submitted by the UNION for arbitration." *Id.*, art. 12 (the "Arbitration Clause"). The 2004 CBA also contained an antidiscrimination clause which provided that Phoenix and the Union "agree not to discriminate against any individual with respect to hiring, compensation, or other terms and conditions of employment because of such individual's race, color, religion, sex, national origin, age, handicap that does not prevent performance of job duties, or sexual preference." *Id.*, art. 14.

**B.      Alleged Instances of Discrimination and Mr. Anderson's Complaints**

Mr. Anderson alleges multiple instances of discrimination that he suffered while working for Phoenix, and states that he complained numerous times about such treatment. The evidence

he presents to support his hostile work environment, disparate treatment based on race, and retaliation claims follows below.

           1.     <u>Racially Derogatory Comments</u>

Mr. Anderson reports that throughout his tenure at Phoenix, there were numerous racially derogatory comments made by his supervisors, which Mr. Anderson contends constitute racial harassment. Mr. Anderson states that he suffered general "harassment and discrimination at Phoenix because of [his] race," leading him to make "complaints to various supervisors." Anderson Aff. ¶ 14.

First, Mr. Anderson states that in 1995 and 1996, he complained to the Union "about the racial discrimination by Joseph Cassano and Charles Carter." *Id.* ¶ 15. Mr. Anderson states that a Union representative "spoke to a few supervisors" at Phoenix about Mr. Anderson's complaints, and that Mr. Anderson was "assured that this racial discrimination would stop," but that the harassment only ceased for a brief period of time. *Id.*

Mr. Anderson states that Mr. Carter referred to himself as the "head nigger in charge" or "HNIC" to Mr. Anderson and other employees in 1995 and 1996, though it is unclear how many times or how often this happened. *Id.* ¶ 16. Mr. Carter is African-American. Dkt. No. 81-10 (Transcript of Deposition of Percy Perdue) ("Perdue Tr."), at 69:23-25. Mr. Carter was a supervisor at this time. *See* Dkt. No. 81-4 (Transcript of Deposition of Charles Carter) ("Carter Tr."), at 10:16-12:3. Mr. Carter denied using any racially charged language at Phoenix, and specifically denied use of the phrase "head nigger in charge" or "HNIC," or the word "nigger." *Id.* at 45:16-46:13.

Mr. Anderson also states that Mr. Cassano used the word "nigger," including in reference to Mr. Anderson, in the warehouse, though again it is unclear how many times or how often this

happened. Anderson Aff. ¶ 17. Mr. Cassano is Caucasian. Perdue Tr. at 70:2. Mr. Anderson

states that he complained to an African-American vice president, Lee Battle, about Mr.

Cassano's language, and that Mr. Anderson was assured that Mr. Cassano would cease using

racially discriminatory language, but that Mr. Cassano reverted to using racist language within

weeks. Anderson Aff. ¶ 17. Mr. Cassano may have been a supervisor in the warehouse at the

time of these complaints. *See* Dkt. No. 81-5 (Transcript of Deposition of Joseph Cassano)

("Cassano Tr."), at 11:20-12:14. *But see* Anderson Aff. ¶ 18 (stating that Mr. Cassano was

promoted to become Mr. Anderson's supervisor "in the early 2000s").

Mr. Anderson states that by the early 2000s, Mr. Cassano had earned a "reputation for

using racially derogatory language" and that Mr. Cassano continued to harass Mr. Anderson

from that time until Mr. Anderson's termination by calling Mr. Anderson "nigger" and "boy,"

but it is unclear how many times or how often this occurred. Anderson Aff. ¶ 18. A Latino truck

driver named Juan Beltre who was supervised by Mr. Cassano from April 4, 2006 to September

19, 2013 states that there were "[m]any times" he observed Mr. Cassano "use derogatory racial

terms in the workplace," including referring to African-American employees as "niggers." Dkt.

No. 84-2 (Affirmation of Juan Beltre) ("Beltre Aff."), ¶¶ 1, 4, 8. And Mr. Perdue, an African-

American supervisor, seems to acknowledge that Mr. Cassano consistently acted and/or spoke

with "racial bias." Perdue Tr. at 58:17-65:12.[2]

---

[2]        The testimony on this topic is not a model of clarity. Mr. Perdue appears to have his
memory refreshed by the discussion of racially derogatory language and a particular "bias
incident." Perdue Tr. at 58:20-61:11. Then, after testifying that he'd heard of "incidents where
derogatory terms [were] used in the warehouse environment," Mr. Perdue states that "this
incident here[, which] jogged my memory," sounded like Mr. Cassano. *Id.* at 61:17-62:7. It is
unclear if Mr. Cassano was actually involved. *Id.* at 52:21-55:6. In his questioning, Plaintiff's
counsel repeatedly references "racial bias" by Mr. Cassano, but Mr. Perdue never explicitly
testifies that Mr. Cassano acted in a racially biased way, let alone that he used racially derogatory
language. *See id.* at 62:15-63:11 ("Q. How often have you heard of [Mr. Cassano] using racial

Specifically, Mr. Anderson states that on one occasion in approximately 2007, Mr. Cassano called Mr. Anderson a "black bastard" and "black son of a bitch," and reminded Mr. Anderson, "I'm the motherfucking boss." Anderson Aff. ¶ 20. Mr. Anderson also alleged that Mr. Cassano used unspecified racially derogatory language toward Mr. Anderson on or about October 29, 2008, about which Mr. Anderson complained to Oscar Ruiz, Jr. *Id.* ¶ 37. Mr. Ruiz was the director of operations. Dkt. No. 81-11 (Transcript of Deposition of Oscar Ruiz, Jr.) ("Ruiz Tr."), at 13:2-12. Mr. Cassano denied making any of those statements or using racially derogatory language while working for Phoenix. Cassano Tr. at 127:17-129:4, 130:7-133:9.

Mr. Anderson also states that from 2006 through his termination, supervisor Anthony Leone called Mr. Anderson and other African-American employees "nigger" and "boy," though it is unclear how many times or how often this occurred. Anderson Aff. ¶¶ 21, 22. Mr. Anderson

---

bias [*sic*] in the workplace?" "A. Well, Joey's just that type of individual. He's a truck driver man, that mentality. He's working in an environment where you got a bunch of ex-offenders and ghetto people that use that language on a day-to-day basis. . . . I mean from that environment you got guys that . . . come from local street environments where they use it, just call each other names and all that stuff, cursing and bitch's mamma and this and all that."); *id.* at 64:20-65:12 ("Q. Have you ever had a conversation with . . . . anyone about [Mr. Cassano's] racial bias in the workplace?" "A. No." "Q. Other than [Mr. Cassano], are there any other individuals at Phoenix Beverages that you know that regularly act—" "A. No, no, no. Not to that extent. No." "Q. When you say not to that extent, do you meant that it might be intermittent with other people but it's constant with [Mr. Cassano]?" "A. Yeah, it would be constant with Joseph, but not—intermittent with other people. Intermittently with other people."). Reviewing the transcript of Mr. Perdue's deposition, it is possible that Mr. Perdue was simply stating that Mr. Cassano was particularly foulmouthed, and—because the questioner did not clarify and Mr. Perdue cut him off—that Mr. Cassano would "call [people] names and all that stuff, cursing and bitch's mamma and this and all that" more frequently than other employees. Despite the possibility that Mr. Perdue was not actually testifying that Mr. Cassano used racially derogatory language or acted in a racially discriminatory manner, I recognize that the Court in this procedural posture is obliged to "'draw all reasonable inferences in favor of the nonmoving party.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). Accordingly, I infer—for the purposes of this motion only—that Mr. Perdue testified that Mr. Cassano "constant[ly]" acted with racial bias.

states that once in 2007, Mr. Leone ordered Mr. Anderson to move garbage, and when Mr. Anderson hesitated, Mr. Leone said, "You do what I tell you, boy." *Id.* ¶ 22. Mr. Anderson also states that during a discussion about politics in the warehouse in the fall of 2007, Mr. Leone said to Mr. Anderson, "You people shouldn't get too excited, this nation isn't ready for a black [president]." *Id.* ¶ 23. Mr. Anderson states that he complained about this language to supervisors including Mr. Carter, Mr. Cassano, Mr. Ruiz, and John Crowley, but that no disciplinary action was taken. *Id.* ¶¶ 21, 22. At the time, Mr. Crowley was the executive vice president and general manager of Phoenix. Dkt. No. 81-6 (Transcript of Deposition of John Crowley) ("Crowley Tr."), at 10:8-19. Mr. Leone is of Italian descent. Dkt. No. 81-9 (Transcript of Deposition of Anthony Leone) ("Leone Tr."),[3] at 97:4-6. Mr. Perdue (an African-American supervisor) testified that Mr. Leone once called him a "nigger" in Spanish. Perdue Tr. at 55:18-56:25. Mr. Leone denied making any of the statements or using any of those words alleged while working for Phoenix. Leone Tr. at 54:12-19, 58:3-59:25, 65:3-69:13, 96:6-21.

Finally, Mr. Anderson states that from 2006 through his termination, supervisor Mitchell Guttman called Mr. Anderson "nigger" and "boy," though it is unclear how many times or how often this occurred. Anderson Aff. ¶¶ 24, 28-33; *see* Beltre Aff. ¶ 12 ("At various times during my employment, I heard Mitch Guttman call African American employees 'boy' while giving orders and commands."). Mr. Anderson states that on March 17, 2008, Mr. Guttman asked another forklift operator where an open line was, and when Mr. Anderson interjected that it was "right in front of you, dumbo," Mr. Guttman replied to Mr. Anderson, "Who asked you, boy?"

---

[3]     The declaration of Phoenix's counsel in support of the summary judgment motion (Dkt. No. 81-3) states that Exhibit 6 (*i.e.*, Dkt. No. 81-9) is the Leone Tr., but that ECF document is a copy of Dkt. No. 81-8, the Transcript of the Deposition of Mitchell Guttman ("Guttman Tr."). The Leone Tr. was provided to the Court in its proper place with the courtesy copy of the motion papers.

Anderson Aff. ¶ 28. When Mr. Anderson confronted Mr. Guttman by asking what he'd just said, Mr. Guttman allegedly replied, "You heard me, boy." *Id.* Mr. Anderson states that he complained that Mr. Guttman had called him "boy" to supervisors including Mr. Carter, Mr. Cassano, Mr. Perdue, Mr. Ruiz, and Mr. Crowley, but that no disciplinary action was taken and no action was taken to cease the harassment. *Id.* ¶¶ 24, 29, 30, 31. In fact, Mr. Anderson reports that when he told Mr. Ruiz about Mr. Guttman's alleged statements, Mr. Ruiz told Mr. Anderson, "I am going to pretend I didn't hear what you said." *Id.* ¶ 30. Mr. Guttman is Jewish.[4] *See* Perdue Tr. at 70:4. Mr. Guttman did not recall (but did not deny) making the statements or using the language alleged by Mr. Anderson; Mr. Guttman testified that he never used the word "boy" in a racial or non-racial context. Guttman Tr. at 142:21-145:2. Mr. Guttman acknowledged that he had a "big mouth[ ], a lot of cursing," but stated that, to his knowledge, Mr. Anderson was never subjected to a racial slur while employed at Phoenix. *Id.* at 166:3-9, 166:23-167:3. However, when deposed, Mr. Ruiz testified that Mr. Guttman admitted that he had called Mr. Anderson "boy" during the incident on March 17, 2008. Ruiz Tr. at 66:22-68:17.

Several witnesses testified about "street talk" at the warehouse, though the testimony varied about whether such language included racially derogatory language. On one hand, supervisor Robert DiFranco testified that the only time he heard an employee use racial slurs was in July 2008, when Mr. Anderson called another African-American employee a "lying nigger" after an accident. Dkt. No. 81-7 (Transcript of Deposition of Robert DiFranco) ("DiFranco Tr."), at 32:8-33:20. On the other hand, Mr. Perdue testified about "an environment where you got a bunch of ex-offenders and ghetto people that use that language on a day-to-day basis," and employees who "come from local street environments where they use [street talk], just call each

---

[4]     Mr. Guttman's skin color and race are not identified in any admissible evidence.

other names and all that stuff, cursing and bitch's mamma and this and all that." Perdue Tr. at

62:19-63:11. And Mr. Guttman stated that employees would say the "N word, F word, you

know, cursing stuff," though he personally would not. Guttman Tr. at 110:12-111:22.

### 2. Disparate Treatment

Mr. Anderson reports several instances when he was treated differently from employees

of other races. Mr. Anderson alleges that he was forced to take on demeaning work outside of his

usual assignments because of his race. Mr. Anderson states that from approximately 2000 to

2008, Mr. Cassano ordered Mr. Anderson to perform janitorial work outside the scope of his

employment duties as a forklift driver because of his race, but it is not clear how many times or

how often this occurred. Anderson Aff. ¶ 19. Mr. Cassano recalled one instance when he directed

Mr. Anderson to sweep the floor after Mr. Anderson had dropped a pallet of glass on the ground,

despite Mr. Cassano's knowledge that typically porters would be assigned to that work rather

than forklift operators. Cassano Tr. at 74:16-80:15. Similarly, Mr. Anderson reports that on one

occasion in 2007, Mr. Leone directed Mr. Anderson to move garbage, and when Mr. Anderson

hesitated to do so, Mr. Leone said, "You do what I tell you, boy." Anderson Aff. ¶ 22.

Mr. Anderson also states that in March 2008, Mr. Ruiz informed Mr. Anderson that he

would not be given any overtime; according to Mr. Anderson, similarly situated white employees

were not denied overtime. *Id.* ¶ 35. Mr. Anderson does not provide any statistical analysis or any

evidence other than his own affirmation to support the allegation of disparate treatment.

### 3. Retaliation

Mr. Anderson also alleges that he made complaints about racially charged language to

Phoenix supervisors, but they proved either unable or unwilling to stop the abusive language. As

discussed above, Mr. Anderson states that he complained to supervisors in 1995 and 1996, but

the problems were not remedied, so Mr. Anderson focused on gaining a promotion and did not make further complaints until 2007 and 2008, when the "harassment escalated greatly." *Id.* ¶ 14.

For example, Mr. Anderson states that in 1995 and 1996, he complained about the racially derogatory language used by Mr. Carter and Mr. Cassano described above to the Union and to supervisors like Mr. Battle, to only temporary effect. *Id.* ¶¶ 15, 17. Similarly, Mr. Anderson states that he reported Mr. Cassano, Mr. Leone, and Mr. Guttman using racial slurs to supervisors at Phoenix in the period from 2006 to 2008, again to little effect. *Id.* ¶¶ 21, 22, 30, 31; *see* Guttman Tr. at 147:4-7 (stating that he was "not aware" of any disciplinary action following March 2008 incident where Mr. Anderson allegedly called Mr. Guttman "dumbo" and Mr. Guttman allegedly referred to Mr. Anderson as "boy"); Cassano Tr. at 110:23-114:8 (testifying that he was not aware of any of Mr. Anderson's complaints against him for his treatment). Mr. Anderson also informed the Union about these latter incidents. Anderson Aff. ¶¶ 32-34; Dkt. Nos. 84-3 & 84-4 (Letters to Union).

In September 2007, Mr. Anderson also filed grievances protesting alleged violations of the seniority and job opening provisions of the CBA. Anderson Aff. ¶¶ 26, 27; Dkt. Nos. 84-7 & 84-8 (Union Grievance Forms). Mr. Anderson also mentioned discrimination in one of his grievance forms. Anderson Aff. ¶ 26; Dkt. No. 84-7 (Union Grievance Form).

Most egregious, however, is Mr. Anderson's statement that following his complaint on or about October 29, 2008 to Mr. Ruiz about Mr. Cassano making racially derogatory remarks, Mr. Ruiz, the director of operations at Phoenix, told Mr. Anderson, "I'm going to get rid of you one of these days" and refused to act on Mr. Anderson's complaint. Anderson Aff. ¶ 37. It was several days later, on November 8, 2008, when Mr. Anderson was terminated, allegedly in

retaliation for his complaints about racial discrimination and a hostile working environment at Phoenix. I now turn to the events directly leading to Mr. Anderson's termination.

4.    <u>The Events of November 7, 2008 and Mr. Anderson's Termination</u>

The crux of Mr. Anderson's discrimination claims is that he was terminated on November 8, 2008 for discriminatory reasons.

Mr. Anderson states that on the evening of November 7, 2008, mere days after Mr. Ruiz allegedly told Mr. Anderson that Phoenix would "get rid of [Mr. Anderson] one of these days," Mr. Anderson received four telephone calls to his home from Union employees. *Id.* ¶ 38. The employees complained that Mr. Guttman was impermissibly smoking inside the warehouse and that the assignment of tasks among workers that night was "unequal." *Id.* In his role as shop steward, Mr. Anderson returned to Phoenix's premises to address the employees' grievances. *Id.* ¶ 39. Mr. Anderson had been granted authority to return to the premises after his shift ended by Mr. Ruiz if such an appearance at the warehouse was connected to Mr. Anderson's duties as shop steward. *Id.* ¶ 40; Ruiz Tr. at 116:5-117:13.

Mr. Anderson arrived at the warehouse at approximately 6 p.m. Anderson Aff. ¶ 41. The details diverge from there. *Compare* Anderson Aff. ¶¶ 38-46, *with* Dkt. No. 84-9 (Arbitrator's Award and Opinion) (the "Arbitration Decision").[5] Mr. Anderson states that he approached a group of employees to discuss their complaints. Anderson Aff. ¶ 41. Mr. Anderson says that he asked Mr. Guttman to stop smoking "because his smoking was preventing the workers [from] finishing all of their work for the evening," and Mr. Guttman responded by saying, "You're not

---

[5]    I note that the Arbitration Decision was rendered after two days of hearings, at which Mr. Anderson testified and was represented by counsel, two other employees testified in support of Mr. Anderson, and the parties stipulated that several other employees would testify similarly to the two who did. Arbitration Decision at 1-2, 12-13 & 13 n.12. Phoenix was also represented by counsel and had six witnesses of its own. *Id.* at 1.

my fucking boss, fuck you, and get the fuck out of here." *Id.* ¶ 42. Mr. Anderson states that he

was escorted out of the Phoenix warehouse approximately 30 minutes after he arrived. *Id.* ¶ 44.

Mr. Anderson says that his colleagues told him that all of the work to be completed on

November 7, 2008 was eventually completed that night. *Id.* ¶ 45. Mr. Anderson was terminated

on November 8, 2008. *Id.* ¶ 46.[6]

The Arbitration Decision contains more detail than Mr. Anderson's affidavit. The

arbitrator summarized the testimony of Mr. Ruiz, who described Phoenix's permissive attitude

toward shop steward meetings generally but stated that a "Union" or shop steward meeting

should not happen without authorization or advance arrangements. Arbitration Decision at 6. Mr.

Ruiz also testified that he was called at home at 6:20 p.m. by Mr. Guttman and the assistant

warehouse manager, Mr. DiFranco, who informed Mr. Ruiz that Mr. Anderson had arrived

unannounced and held a meeting with the employees; Mr. Ruiz told them that Mr. Anderson

should be given a "direct order" to leave, but that some 25 minutes later, Messrs. Guttman and

DiFranco called Mr. Ruiz again and told him that Mr. Anderson would not leave. *Id.* Mr. Ruiz

directed that security be called and Mr. Anderson be removed from the premises. *Id.* Mr. Ruiz

further noted that he himself returned to the warehouse that night and held a meeting with the

employees, who told him that they did not have any pressing concerns or issues, just a complaint

of favoritism in assignments toward a certain employee. *Id.* at 7; Ruiz Tr. at 111:6-112:5.

---

[6] The decision to terminate Mr. Anderson would have been made by Mr. Crowley—the
executive vice president and general manager of Phoenix—and Phoenix's "executive team,"
including Rod and Greg Brayman. Ruiz Tr. at 123:7-23. Mr. Ruiz testified that he spoke to Mr.
Crowley but did not give a recommendation as to what should be done after the incident. *Id.* at
123:24-125:8. Mr. Crowley testified that Mr. Ruiz was "possibly involved" in Mr. Anderson's
termination, as was Mr. Battle, a vice president of Phoenix. Crowley Tr. at 80:22-83:7. Mr.
DiFranco, although lower in the organizational hierarchy, testified that he thought Mr. Ruiz was
involved in some way. DiFranco Tr. at 90:25-91:19.

One supervisor, Joel Smith, testified that he saw Mr. Anderson walk into the warehouse sometime after 6 p.m., state that he was there "to take care of Union business," and gather the employees, stopping work. Arbitration Decision at 7. Mr. Guttman testified similarly, describing his and Mr. DiFranco's efforts shortly after 6 p.m. to encourage the employees to work. *Id.* Mr. Guttman testified that Mr. Anderson approached him and Mr. DiFranco, and Mr. Anderson told Mr. Guttman that he wasn't supposed to smoke in the warehouse (Phoenix had instituted a rule prohibiting smoking inside the warehouse). *Id.* at 8; *see* Guttman Tr. at 190:15-191:20, 197:12-24. Mr. Guttman testified that he replied, "You're not my boss," and ordered Mr. Anderson to leave the building. Arbitration Decision at 8. Mr. Guttman testified that Mr. Anderson became aggressive, that Mr. Anderson grabbed Mr. Guttman and physically bumped him, and that Mr. Smith and Mr. DiFranco eventually interceded and escorted Mr. Anderson outside. *Id.*; *see* Guttman Tr. at 202:2-204:21.

Mr. DiFranco largely confirmed Mr. Guttman's testimony before the arbitrator, including the timing (shortly after 6 p.m.), Mr. Anderson's statement (that Mr. Guttman should not be smoking), and the physical altercation between Mr. Anderson and Mr. Guttman. Arbitration Decision at 8; *see* DiFranco Tr. at 82:21-88:16. Mr. DiFranco also testified that Mr. Anderson raised employees' "concerns" about being "treated fairly" in terms of assignments, and Mr. DiFranco told Mr. Anderson that these concerns could have been raised at a meeting on the following Monday (these events occurred on a Friday night), but Mr. Anderson refused to be placated and reentered the warehouse, forcing Mr. DiFranco to call security and to direct the employees to return to work. Arbitration Decision at 8-9; DiFranco Tr. at 80:22-81:8.

During the arbitration proceeding, Phoenix also introduced warehouse surveillance video tapes showing that from approximately 6 p.m. to 6:15 p.m., no employees were working in the

warehouse. Arbitration Decision at 9. Some work resumed by 6:30 p.m., though many employees were still standing around at 6:35 p.m. *Id.* At 6:41 p.m., work resumed. *Id.* The video does not show any of Mr. Anderson's actions, but the arbitrator found it relevant regarding "the amount of activity or inactivity that was taking place on the warehouse floor." *Id.* at 9 n.6. Mr. DiFranco acknowledged that all necessary work was ultimately completed that night. *Id.* at 9 n.5.

The Arbitration Decision also reviewed the evidence offered by Mr. Anderson. Mr. Anderson testified that after receiving four calls at home about unfair distribution of work, he returned to the warehouse with the intention of speaking to the four employees who called and taking their complaints to management. *Id.* at 10. Mr. Anderson recounted a prior meeting with Mr. Ruiz and Union representatives when he was granted permission to stay after his shift ended or to return after-hours because he was a shop steward. *Id.* at 10-11.

Contrary to his affidavit and the testimony of the Phoenix supervisors, Mr. Anderson testified that he arrived after 6:30 p.m. and that the employees were already gathered in one area. *Id.* at 11. Mr. Anderson testified that he met with the employees for about ten minutes, then went to speak to Mr. DiFranco about the alleged unfair distribution of work and Mr. Guttman's smoking in violation of Phoenix policy. *Id.* Mr. Anderson testified that Mr. Guttman was standing nearby and, hearing the statements about himself, got angry and told Mr. Anderson that Mr. Anderson was "not my fucking boss" and "can't tell me what to do," and, further, told Mr. Anderson to "get the fuck out of my warehouse." *Id.* Mr. Anderson denied touching or grabbing Mr. Guttman, instead saying that he'd speak with Mr. Ruiz the following Monday about Mr. Guttman smoking in the warehouse; according to Mr. Anderson, Mr. Guttman escalated the situation by raising his voice and putting his chest against Mr. Anderson. *Id.*

Mr. Anderson testified that to let cooler heads prevail, he left the warehouse with Mr. DiFranco. *Id.* Mr. Anderson testified that when he was informed that Mr. Ruiz wanted him to leave, Mr. Anderson returned to the warehouse to pick up his belongings and left. *Id.* Mr. Anderson stated that he believed he did nothing wrong that night; according to Mr. Anderson, he was not confrontational or disrespectful, was at the warehouse for no more than 30 minutes, had not caused a work stoppage, and was merely fulfilling his role as shop steward by investigating complaints and communicating them to Phoenix management. *Id.* at 12.

An employee, Melanio Torres, testified that the employees had grown increasingly frustrated about the allegedly disrespectful way managers spoke to employees that week and the lack of a wage increase in the year preceding this incident. *Id.* Mr. Torres stated that there was no issue of Mr. Guttman smoking in the warehouse. *Id.* at 12 n.10. Mr. Torres testified that Mr. Anderson did not call a meeting, but rather that approximately 15 employees were waiting for work and approached Mr. Anderson when he appeared. *Id.* at 12. Mr. Torres testified that the meeting lasted only five or ten minutes. *Id.* Mr. Torres also testified that Mr. Anderson told Mr. Guttman that he should not smoke in the warehouse, and that Mr. Guttman got angry but there was never any physical altercation. *Id.* at 12-13. Mr. Torres stated that Mr. Anderson came back into the warehouse to say goodbye to the employees, though he was continually being told to leave the premises. *Id.* at 13 n.11. Employee Socrates Lopez largely confirmed this course of events. *Id.* at 13.

Ultimately, the arbitrator concluded that Mr. Anderson, despite ample opportunity to do so, willfully declined to notify the Phoenix officials working that night that he was returning to the warehouse and planning to meet with employees. *Id.* at 14-15. The arbitrator noted that Mr. Anderson "had no reasonable basis for his fast-flying, unannounced entry into the warehouse and

15

his unilateral decision to interview employees already on their work time" because the issues faced by the employees did not encompass immediate safety concerns or an emergency situation. *Id.* at 15; *see also* Anderson Aff. ¶ 38 (stating that Anderson was notified of Mr. Guttman smoking in the warehouse and the "unequal assignment of tasks among workers that evening").

The arbitrator repeated Mr. Anderson's testimony that his presence was not disruptive and that his conduct did not interfere with the ongoing work at the warehouse. Arbitration Decision at 15. Therefore, Mr. Anderson argued in the arbitration, there was no work stoppage, slowdown, or other interruption of the work. *Id.* at 15-16. The arbitrator rejected this contention and found the Phoenix supervisors' testimony more credible, especially with the surveillance tape of the warehouse floor. *Id.* at 16. The arbitrator concluded that some work was being done at 6:10 p.m. or 6:11 p.m., but between 6:15 p.m. and approximately 6:26 p.m., no activity occurred on the floor at all; the arbitrator concluded that a group of employees finally dispersed by 6:41 p.m. and regular work resumed. *Id.*

Accordingly, the arbitrator concluded that "for a period of at least [25] minutes—during the exact time that [Phoenix] officials testified that [Mr. Anderson] was meeting with employees—work had stopped. By definition, therefore, [Mr. Anderson's] unauthorized meeting with the workers interfered with [Phoenix's] business operations and his conduct directly violated Article 22 of the [2004 CBA]." *Id.* The arbitrator further concluded that Mr. Anderson "was involved in continued misconduct" through his failure or refusal to leave Phoenix's premises despite repeated instructions to do so. *Id.* at 17. Thus, the arbitrator determined that Mr. Anderson exceeded the limits of permissible shop steward activity by causing an improper work stoppage and refusing direct orders to leave the premises, and that Phoenix had just cause to terminate Mr. Anderson on November 8, 2008. *Id.* at 17-18.

Significantly, Mr. Anderson did not raise the issue of discrimination, whether due to his race or in retaliation for his complaints, at any time during the arbitration proceeding. Mr. Anderson's race and history of engaging in protected activity are not discussed in the Arbitration Decision. *See generally* Arbitration Decision; *see also* Ruiz Tr. at 134:15-23 (racial discrimination not addressed at arbitration proceeding); Guttman Tr. at 218:11-18 (similar).

## II.   PROCEDURAL HISTORY

Following his termination, Mr. Anderson complained to the Union that he was improperly dismissed. Anderson Aff. ¶ 47. Pursuant to the 2004 CBA, the Union filed a request for arbitration on Mr. Anderson's behalf for improper dismissal. *Id.* ¶ 48. Arbitration hearings were held before arbitrator Jay Nadelbach, Esq. on January 16, 2009 and January 23, 2009. As discussed, Mr. Anderson was represented by counsel and testified along with several employees, and Phoenix was also represented by counsel and had several supervisors and an IT systems manager testify. Neither racial discrimination nor retaliation was raised as part of Mr. Anderson's defense. *See generally* Arbitration Decision. In the Arbitration Decision, dated March 3, 2009, the arbitrator concluded that Phoenix had just cause to discharge Mr. Anderson because he "orchestrat[ed] an inappropriate meeting with employees on work time [that] resulted in an improper stoppage" and "compounded his wrongful behavior by refusing to obey several direct orders to leave the premises." *Id.* at 17-18.

The Union also filed unfair labor practice charges against Phoenix with the National Labor Relations Board (the "NLRB"), alleging that Phoenix discharged Mr. Anderson for engaging in protected activity related to his position as a shop steward, in violation of the National Labor Relations Act (the "NLRA"). *See* Dkt. No. 81-16 (NLRB Dismissal). The NLRB investigated Mr. Anderson's charge and dismissed it in a letter dated May 27, 2009. *Id.*

Following these setbacks, Mr. Anderson submitted a complaint to the New York State Division of Human Rights (the "NYSDHR") on June 3, 2009, alleging unlawful discriminatory labor practices related to race. Anderson Aff. ¶ 55. Mr. Anderson's complaint with the NYSDHR was dismissed on September 28, 2011. *Id.*; Dkt. No. 20 (Letter attaching complaint and NYSDHR determination). On July 6, 2009, Mr. Anderson filed another complaint with the NLRB alleging that the Union did not properly represent him, but that complaint was dismissed on September 2, 2009. Anderson Aff. ¶ 57; Dkt. No. 84-14 (NLRB Dismissal).

Also on June 3, 2009, Mr. Anderson filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), but this complaint was dismissed and Plaintiff received a notice of his right to sue on December 2, 2011. Anderson Aff. ¶¶ 56, 58; Dkt. No. 84-15 (EEOC Dismissal and Notice of Rights). The instant litigation followed on February 27, 2012.

## III.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether a genuine issue of fact exists on summary judgment, "'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Reeves*, 530 U.S. at 150 (citations omitted); *accord Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

"[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact[;] once such a showing is made, the non-movant must 'set forth specific

facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). In a Title VII case like this one, this inquiry "often requires an assessment of individuals' motivations and state of mind, matters that call for a 'sparing' use of the summary judgment device because of juries' special advantages over judges in this area." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

Nonetheless, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Moreover, "[t]he mere existence of a scintilla of evidence supporting the [non-movant's] case will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the Court must enter summary judgment. *See Celotex*, 477 U.S. at 322.

## B.   Title VII

Title VII was created to help ensure "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (citation omitted). Under the framework

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burdens of

production and burden of proof are allocated as to Title VII discrimination and retaliation claims

in the following manner: first, the plaintiff must establish a prima facie case of discrimination;

second, the defendant must articulate a legitimate, nondiscriminatory reason for the employment

action; and third, the burden shifts back to the plaintiff, who must prove by a preponderance of

the evidence that the reason offered by the defendant was not the true reason but a pretext for

discrimination. *See Reeves*, 530 U.S. at 142-43. The plaintiff bears the ultimate burden of proof.

*See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, with regard to

establishing a prima facie claim of discrimination or retaliation, the plaintiff's burden is *de*

*minimis*, and the Court's only role is to determine whether proffered admissible evidence would

be sufficient for a rational factfinder to infer a retaliatory motive. *See Hicks*, 593 F.3d at 164.

I address the elements of Mr. Anderson's claims for a hostile work environment,

disparate treatment based on racial discrimination, and retaliation for protected activity under

Title VII in turn below.

## IV.    ANALYSIS

### A.    Application of *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009)

As an initial matter, Defendant argues that, based on the Supreme Court's holding in *14*

*Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009), the Arbitration Clause precludes the instant

lawsuit. Defendant is incorrect.

In *14 Penn Plaza*, the Supreme Court held that a CBA that "clearly and unmistakably

requires union members to arbitrate [Age Discrimination in Employment Act (the 'ADEA')]

claims is enforceable as a matter of federal law." *Id.* at 274. In that case, a union member sued

his employer for employment discrimination under the ADEA. *Id.* at 253-54. The union had

negotiated a CBA with the employer as permitted by the NLRA, and the CBA prohibited discrimination under specific federal statutes, including the ADEA, while providing that all such claims under those statutes "shall be subject to the grievance and arbitration procedure . . . as the sole and exclusive remedy for violations." *Id.* at 252.

The Supreme Court concluded that the employee's ADEA claims were required to be arbitrated because the CBA "clearly and unmistakably" covered ADEA claims and the ADEA was not exempted from the "broad sweep" of the NLRA. *Id.* at 257-60. The Court emphasized that the CBA specifically named the antidiscrimination statutes that were subject to arbitration, and distinguished earlier cases where the arbitration clause had not expressly done so and the employees therefore "had not agreed to arbitrate their statutory claims." *Id.* at 252, 261-64. As Justice Thomas summarized, writing for the Court, "[T]here is no legal basis for the Court to strike down the arbitration clause in this CBA, which was freely negotiated by the Union and the [employer], and which clearly and unmistakably requires [employees] to arbitrate the age-discrimination claims at issue in this appeal. Congress has chosen to allow arbitration of ADEA claims. The Judiciary must respect that choice." *Id.* at 260.

However, where an arbitration clause does not "clearly and unmistakably require[ ] [an employee] to arbitrate" his statutory claims at issue (*id.*), a lawsuit is not precluded by the arbitration clause. "A 'clear and unmistakable' waiver exists where one of two requirements is met: (1) if the arbitration clause contains an explicit provision whereby an employee specifically agrees to submit all causes of action arising out of his employment to arbitration; or (2) where the arbitration clause specifically references or incorporates a statute into the agreement to arbitrate disputes." *Alderman v. 21 Club Inc.*, 733 F. Supp. 2d 461, 469 (S.D.N.Y. 2010) (citations omitted); *accord Quintanilla v. Suffolk Paving Corp.*, 2011 WL 1323033, at *3

(E.D.N.Y. Feb. 10, 2011), *adopted by*, 2011 WL 1253248 (E.D.N.Y. Mar. 28, 2011). In this case, for the reasons described below, the Arbitration Clause did not "clearly and unmistakably" require Mr. Anderson to arbitrate his Title VII claims pursuant to *14 Penn Plaza* and case law in this Circuit.

The 2004 CBA was executed on January 5, 2004 but made retroactively effective from November 16, 2003 to January 15, 2009. 2004 CBA, pmbl. & art. 30. Thus, the alleged events leading to Mr. Anderson's termination and the instant lawsuit took place when the 2004 CBA was in effect. *See* Am. Compl. ¶¶ 17, 18, 24, 25, 31-58. The 2004 CBA represents an agreement between the Union, of which Mr. Anderson was a member, and Phoenix. *See* Anderson Aff. ¶¶ 5, 7. The Arbitration Clause provides, in relevant part:

> All disputes between [Phoenix] and the UNION and/or any employees shall be promptly taken up for adjustment by the UNION through its duly authorized agents. In the event that no adjustment shall be possible by direct negotiation between [Phoenix] and the UNION, with[in] thirty (30) days thereafter the matter may be submitted by the UNION for arbitration and such arbitrator's decision or award shall be final and binding upon both parties to this Agreement. . . .

> If a matter is not submitted to arbitration within thirty (30) days after the parties have met on the dispute and have agreed they cannot settle [the] dispute, the matter shall be deemed finally ended.

2004 CBA, art. 12.

The 2004 CBA also contains an antidiscrimination clause, which provides:

> [Phoenix] and the UNION agree not to discriminate against any individual with respect to hiring, compensation, or other terms and conditions of employment because of such individual's race, color, religion, sex, national origin, age, handicap that does not prevent performance of job duties, or sexual preference, nor will they limit, segregate or classify employees in any way to deprive any individual employment opportunities because of race, color, religion, sex, national origin, age, handicap that does not prevent performance of job duties, or sexual preference.

2004 CBA, art. 14. These provisions did not "clearly and unmistakably" require Mr. Anderson to arbitrate his discrimination and retaliation claims.

First, the Arbitration Clause does not explicitly require an employee to submit all causes of action arising out of his employment to arbitration. The Arbitration Clause provides that "[a]ll disputes between [Phoenix] and . . . any employees shall be promptly taken up for adjustment by the UNION through its duly authorized agents." 2004 CBA, art. 12. To the extent that "no adjustment shall be possible by direct negotiation . . . the matter *may be submitted by the UNION for arbitration*." *Id.* (emphasis added). Phoenix argues, without support, that the word "may" merely refers to the Union's "discretion not to pursue a meritless dispute to arbitration." Dkt. No. 81-1 (Memorandum in Support), at 21 n.2. But it is not apparent why this is the only or natural reading of the Arbitration Clause or, indeed, why the CBA would not have been drafted more carefully if this were the intention.

Accordingly, "it is unclear whether the [2004] CBA actually mandates arbitration," and I conclude that the Arbitration Clause does not require Mr. Anderson to arbitrate all causes of action arising out of his employment. *Bright-Asante v. Saks & Co.*, -- F. Supp. 3d --, 2017 WL 1064890, at *7 (S.D.N.Y. Mar. 16, 2017) (arbitration not required when CBA states that adjustment must be attempted "'before the dispute *shall* be referred for arbitration'" and also that an employee or the union "'may' submit an unsettled grievance to arbitration as the final step of the grievance procedure") (emphasis in original); *see Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 40 n.3 (1974) (arbitration not required when CBA provided that "should any trouble arise in the plant, . . . an earnest effort shall be made by both the Company and the Union to settle such differences promptly," and after several steps, "[g]rievances which have not been settled under the foregoing procedure may be referred to arbitration").

Second, the 2004 CBA does not specifically enumerate any federal statute or claim that must be arbitrated. On this point, I concur in large part with the recent opinion of Judge Griesa in

the Southern District of New York, who analyzed a CBA with provisions that were practically identical (including typographical errors) and concluded that the CBA did not "clearly and unmistakably" require an employee to arbitrate his statutory claims. *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 361 (S.D.N.Y. 2016); *see* 12-cv-01968-TPG, Dkt. No. 41-1 (S.D.N.Y.) (relevant CBA).

In *Fernandez*, an employee sued Phoenix and other related entities for damages pursuant to the Family Medical Leave Act and state and city human rights laws. 159 F. Supp. 3d at 355.[7] Reviewing *14 Penn Plaza*, other Supreme Court decisions, and decisions in the Second Circuit, Judge Griesa distinguished between "cases where the operative CBA specifically referenced statutes," like *14 Penn Plaza*, and "cases where the applicable CBA contained a broad definition of what is arbitrable as well as a general nondiscrimination clause, but did not specifically reference statutory discrimination provisions." *Id.* at 359-60. Judge Griesa's reading of *14 Penn Plaza*—in which the Supreme Court itself distinguished the applicable CBA, which ultimately required arbitration, from one that "d[oes] not expressly reference the statutory claim at issue"— is persuasive. *See 14 Penn Plaza*, 556 U.S. at 263 (discussing *Alexander*, 415 U.S. 36); *see also Alderman*, 733 F. Supp. 2d at 468-70 ("Arbitration clauses that cover any dispute concerning the interpretation, application, or claimed violation of a specific term or provision of the [CBA] do not contain the requisite 'clear and unmistakable' waiver because 'the degree of generality [in the arbitration provision] falls far short of a specific agreement to submit all federal claims to arbitration.'") (quoting *Rogers v. New York Univ.*, 220 F.3d 73, 76 (2d Cir. 2000)).

The 2004 CBA here, as in *Fernandez*, is too broad to be analogous to the CBA in *14 Penn Plaza*. Neither the Arbitration Clause nor the antidiscrimination clause in the 2004 CBA

---

[7]     In *Fernandez*, as in this case, Phoenix was represented by Mr. D'Ablemont and his firm.

"reference[s] any specific antidiscrimination statute that would be subject to exclusive arbitration, nor [do they] specify whether arbitration is required for state or federal claims at all." *Fernandez*, 159 F. Supp. 3d at 361. Thus, "'the degree of generality falls far short of a specific agreement to submit all federal claims to arbitration.'" *Alderman*, 733 F. Supp. 2d at 470 (citation omitted). Accordingly, as in *Fernandez*, "the arbitration and antidiscrimination clauses above do not mandate arbitration of [Mr. Anderson's] statutory claims." *Fernandez*, 159 F. Supp. 3d at 361; *accord Quintanilla*, 2011 WL 1323033, at *5 (arbitration not required when CBA provisions "do not expressly specify that all disputes, including those arising under federal law, are subject to arbitration, nor do they mention [the Fair Labor Standards Act ('FLSA')] in the arbitration clause").[8]

---

[8]      The cases cited by Phoenix are inapposite. Dkt. No. 81-1 (Memorandum in Support), at 19-22. Some of them involve CBAs with explicit references to statutory claims that must be arbitrated. *E.g.*, *14 Penn Plaza*, 556 U.S. at 252 ("'claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act [(the 'ADA')], [or] the [ADEA] . . . . shall be subject to the grievance and arbitration procedure . . . as the sole and exclusive remedy for violations.'"); *Borden v. Wavecrest Mgmt. Team Ltd.*, 2012 WL 4094959, at *2 (S.D.N.Y. Sept. 18, 2012) ("The CBA governing Borden's employment contract contains a broad arbitration clause which expressly requires that claims under the ADA or other anti-discrimination statutes be addressed through the CBA's grievance and arbitration procedure."); *Johnson v. Tishman Speyer Props., L.P.*, 2009 WL 3364038, at *2-3 (S.D.N.Y. Oct. 16, 2009) ("The CBA provides that employment discrimination claims made pursuant to, *inter alia*, Title VII, the [state human rights law, and the city human rights law] 'shall be subject to the grievance and arbitration procedure . . . as the sole and exclusive remedy for violations.'"). Others involve CBAs where the context makes it clear that arbitration is required for certain claims. *E.g.*, *Hodges v. All Transit LLC*, 2014 WL 537748, at *2 (E.D.N.Y. Feb. 7, 2014) ("The Arbitration Provision is seemingly broad in that it covers 'all' disputes, yet quite specific in that covered disputes include those 'relating to wages [and] hours,'" and therefore FLSA claims must be arbitrated); *Babcock v. Butler Cty.*, 2012 WL 1655737, at *3 (W.D. Pa. May 10, 2012) (requiring arbitration of FLSA claims when CBA institutes mandatory grievance procedure to resolve "'[a]ll disputes . . . relating to the application or interpretation of [the CBA] and/or any dispute concerning the wages, hours, and working conditions of employees covered by this [CBA].'"). Phoenix also cites cases applying the doctrine of collateral estoppel and discussing the preclusive effect of arbitral proceedings, which are not relevant to the issue of whether a CBA *requires* certain claims to be arbitrated. *E.g.*, *Robbins v. U.S. Foodservice, Inc.*, 2012 WL 3781258, at *4 (D.N.J.

This conclusion applies with equal force to Mr. Anderson's retaliation claim. "Retaliation . . . . is a form of discrimination because the complainant is being subjected to differential treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). "Because the [2004] CBA does not clearly and unmistakably require arbitration of statutory discrimination claims (and does not treat retaliation separately from discrimination), Plaintiff's retaliation claims, like his discrimination claims, may be pursued in federal court." *Lawrence v. Sol G. Atlas Realty Co.*, 841 F.3d 81, 85-86 (2d Cir. 2016).

## B.      Hostile Work Environment Claim

To establish a hostile work environment claim under Title VII, a plaintiff must "produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citation omitted). In other words, a "plaintiff must establish: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment; and (2) a specific basis . . . for imputing the conduct that created the hostile environment to the employer." *Dash v. Bd. of Educ. of City Sch. Dist. of New York*, -- F. Supp. 3d --, 2017 WL 838226, at *6 (E.D.N.Y. Mar. 3, 2017) (internal quotation marks and citations omitted).[9]

_____

Aug. 30, 2012); *Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 578-82 (S.D.N.Y. 2011).

[9]      Defendant argues that an adverse employment action is required to establish a hostile work environment. *See* Dkt. No. 81-1 (Memorandum in Support), at 23-24. Defendant is incorrect. *See Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 313 (E.D.N.Y. 2014) ("[A]n adverse employment action is not always required to sustain a hostile work environment claim.") (citations omitted); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (hostile work environment claim does not require plaintiff to "suffe[r] injury. . . . [s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive");

As to the first prong, "[t]he standard is disjunctive," meaning that a plaintiff must establish that harassing conduct was either severe or pervasive: "'To withstand summary judgment, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment.'" *Dash*, -- F. Supp. 3d --, 2017 WL 838226, at *6 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)). The plaintiff must show that he subjectively perceived that the environment was abusive and that a reasonable person would find the environment objectively hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *accord Gorzynski*, 596 F.3d at 102. "The objective hostility of a work environment depends on the totality of the circumstances. . . . [from] the perspective . . . of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks and citations omitted). "Accordingly, to analyze a hostile work environment claim, we are required to look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gorzynski*, 596 F.3d at 102 (citations omitted).

---

*Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) ("Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is 'abusive.'") (citations omitted).

A plaintiff raising a hostile work environment claim based on race "must show that race was a specific basis for the conduct complained of." *Dash*, -- F. Supp. 3d --, 2017 WL 838226, at *7 (citation omitted). Evidence of a hostile work environment based on race in the current record includes Mr. Anderson's sworn statements that he was subjected to racially charged epithets from supervisors and was given demeaning assignments outside of his job responsibilities because of his race. Specifically, Mr. Anderson states that supervisors at Phoenix called him (and other African-American employees) "nigger" or "boy" on numerous occasions. Mr. Anderson also states that he would occasionally be given janitorial work outside of his job responsibilities because of his race. Accordingly, a reasonable jury could conclude that Mr. Anderson viewed his working environment as subjectively hostile and abusive.[10]

Furthermore, in the entirety of the circumstances, I conclude that a reasonable jury could find that the conduct complained of created an objectively hostile or abusive environment based on Mr. Anderson's race. "The message relayed through all of the harassment appears to this Court to be unambiguously demeaning, and sufficient for the Court to conclude that a reasonable person would have found that [the supervisors'] conduct contributed materially to the creation of a hostile work environment." *Benedith*, 38 F. Supp. 3d at 314 (citation omitted).

---

[10]      Plaintiff's affidavit is self-serving, but that is not sufficient reason to disregard competent evidence at this stage. *E.g.*, *Lee v. Am. Int'l Grp., Inc.*, 31 F. App'x 764, 765 (2d Cir. 2002) (summary order) (vacating summary judgment for defendant on age discrimination claim because plaintiff's affidavit—which included alleged statement by defendant's officer who may have had a role in making adverse employment decision—"was competent evidence" that should have been "credited by the court in ruling on the motion" even though the officer filed her own affidavit expressly denying the statement); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("There is nothing in [Rule 56] to suggest that nonmovants' affidavits cannot—as a matter of law—suffice to defend against a motion for summary judgment. . . . To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits. Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere.") (citation omitted).

"A recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted). "However, while a few isolated racial slurs may not create a hostile work environment, the repeated use of certain clearly offensive and abusive language can create a hostile work environment." *Benedith*, 38 F. Supp. 3d at 314 (citations omitted); *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 22 n.5 (2d Cir. 2014) ("[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.") (internal quotation marks and citations omitted).

Courts have repeatedly concluded that the use of the word "nigger" in the workplace is particularly odious and offensive. As the Second Circuit has written, "We emphasize that '[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.'" *Rivera*, 743 F.3d at 24 (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)); *accord White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) ("'Far more than a "mere offensive utterance, the word "nigger" is pure anathema to African-Americans."'") (citations omitted). The Seventh Circuit has also noted that "[g]iven American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (citations omitted) (*quoted in Benedith*, 38 F. Supp. 3d at 314).

Here, for purposes of the instant motion, there is ample evidence that racial slurs were used on Phoenix's premises. Mr. Anderson stated that he suffered racial abuse throughout his tenure at Phoenix, including Mr. Carter calling himself the "head nigger in charge" or "HNIC," Mr. Cassano using the word "nigger" and earning a reputation for using racially derogatory language, and Mr. Leone and Mr. Guttman referring to Mr. Anderson and other African-American employees as "nigger" and "boy." Anderson Aff. ¶¶ 15-18, 20-24, 28-33.

Moreover, other witnesses mentioned "street talk" and the use of racial slurs. Mr. Beltre states in his affidavit that there were "[m]any times" he observed Mr. Cassano "use derogatory racial terms in the workplace," including referring to African-American employees as "niggers," and that he heard Mr. Guttman call African-American employees "boy." Beltre Aff. ¶¶ 8, 12; *see also* Ruiz Tr. at 66:22-68:17 (testifying that Mr. Guttman admitted calling Mr. Anderson "boy"). Mr. Guttman acknowledged that employees would say the "N word, F word, you know, cursing stuff," though he personally would not. Guttman Tr. at 110:12-111:22. Finally, when asked about "racial bias in the workplace," Mr. Perdue testified about "an environment where you got a bunch of ex-offenders and ghetto people that use that language on a day-to-day basis." Perdue Tr. at 62:15-22; *see also id.* at 55:18-56:25 (testifying that Mr. Leone once called him "nigger" in Spanish).

Like in *Benedith*, "taken together, the Court finds that issues of fact exist as to whether the frequency and severity of the harassment alleged in this case materially altered [Mr. Anderson's] work environment for the worse." *Benedith*, 38 F. Supp. 3d at 314; *cf. Albert-Roberts v. GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (summary order) ("There may well exist circumstances where a single use of the word 'nigger' would rise to the level of a hostile work environment, but on the facts present here, this is not such a case."). The fact that

one of the supervisors who allegedly made abusive statements and allegedly assigned demeaning tasks outside of Plaintiff's normal work responsibilities is African-American "does not alter this Court's determination that a reasonable jury could find that the working environment was objectively hostile for [Mr. Anderson] on the basis of [his] race." *Benedith*, 38 F. Supp. 3d at 314.[11] Viewing the record in the light most favorable to Mr. Anderson, under the totality of the circumstances, I conclude that Mr. Anderson has satisfied the first prong of the hostile work environment inquiry for purposes of averting the entry of summary judgment.

I now turn to the second prong, whether the hostile work environment may be imputed to Phoenix. "When, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." *Gorzynski*, 596 F.3d at 103 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher*, 524 U.S. at 807). Mr. Anderson states that Messrs. Carter, Cassano, Guttman, and Leone—*i.e.*, those who made the allegedly racially charged statements to Mr. Anderson—supervised Mr. Anderson during his tenure at Phoenix. Anderson Aff. ¶¶ 9-13. Messrs. Carter, Cassano, Guttman, and Leone did not deny supervising Mr. Anderson. *E.g.*, Carter Tr. at 32:7-12; Cassano Tr. at 36:18-19. Thus, I conclude that Mr. Anderson satisfies the second prong of a hostile work environment claim.[12]

---

[11] I note that while *Benedith* involved hostile work environment claims under 42 U.S.C. §§ 1981 and 1983 and state human rights law, rather than Title VII, the analysis is practically the same. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006).

[12] An employer may counter an imputation of a hostile work environment claim to it through the *Faragher/Ellerth* affirmative defense, by which the employer establishes both that "the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior," and that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Phoenix has not explicitly cited this affirmative defense. *See* Dkt. No. 81-1 (Memorandum in Support), at 22-24; Dkt. No. 85 (Reply Memorandum), at 9-10. To the extent that Phoenix's argument that Mr. Anderson

I find that a reasonable jury viewing all of the evidence in the totality of the circumstances could conclude that Mr. Anderson has established a claim of a hostile work environment based on his race. Accordingly, I respectfully recommend that Phoenix's motion for summary judgment be denied as to this claim.

### C.      Racial Discrimination Claim

Title VII provides that it is an "unlawful employment practice" for an employer to, *inter alia*, "discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m). Thus, an employment decision violates Title VII whether it is "based in whole or in part on [racial] discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (emphasis removed).

A plaintiff who alleges racial discrimination is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). To establish a prima facie case, the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Holcomb*, 521 F.3d at 138. As described above, if a plaintiff

---

"[n]ever . . . mentioned" the hostile work environment on Phoenix's premises (Dkt. No. 85 (Reply Memorandum), at 9) can be construed as raising this affirmative defense, I respectfully recommend that the Court reject it. Mr. Anderson's statements that he reported the harassment and abusive language must be credited at this stage, and there is insufficient evidence in the record to establish that Phoenix "exercised reasonable care to prevent and correct promptly" (*Faragher*, 524 U.S. at 807) the conduct. *E.g.*, Anderson Aff. ¶¶ 21, 22, 30, 31; Guttman Tr. at 147:4-11; Cassano Tr. at 110:23-114:8.

establishes a prima facie case of racial discrimination, then the burden shifts to the defendant

employer to provide a legitimate, nondiscriminatory reason for the action. *Id.*; *accord Reeves*,

530 U.S. at 142-43. If the defendant makes such a showing, then the burden shifts back to the

plaintiff to prove by a preponderance of the evidence that discrimination occurred, by, for

example, showing that the employer's proffered reason is pretextual. *Littlejohn*, 795 F.3d at 307-

08; *accord Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014).

### 1.    Prima Facie Case

Two of the four elements of a prima facie case are not at issue here. Mr. Anderson is a

member of a protected class, African-Americans, and suffered an adverse employment action

when he was terminated on November 8, 2008. Mr. Anderson's qualification for his job is also

not disputed; Mr. Anderson had been employed at Phoenix for approximately 15 years at the

time of his termination (*see* Anderson Aff. ¶ 3), and his supervisors considered him a good

employee generally (*see* Guttman Tr. at 136:10-20; Cassano Tr. at 108:9-25). *See Gregory v.*

*Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (discharged employee need only "make the 'minimal

showing' that '[he] possesses the basic skills necessary for performance of [the] job,'" and "by

hiring the employee, the employer itself has already expressed a belief that [he] is minimally

qualified.") (citation omitted). Thus, the remaining component of the prima facie case is

establishing that Mr. Anderson's termination arose under circumstances giving rise to an

inference of unlawful racial discrimination.

One way a plaintiff may establish such an inference for purposes of establishing a prima

facie case is by showing disparate treatment: "that is, a showing that the employer treated [the]

plaintiff less favorably than a similarly situated employee outside his protected group." *Mandell*

*v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). A plaintiff attempting to show disparate

treatment must demonstrate that he is "similarly situated in all material respects" to the individuals with whom he seeks to compare himself. *Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). There is no consistent meaning of the term "similarly situated," but a plaintiff must show "'a reasonably close resemblance of facts and circumstances' and there must be an objectively identifiable basis for comparability." *Id.* (quoting *Graham*, 230 F.3d at 40). The plaintiff must show that these "similarly situated employees": (i) "[were] subject to the same performance evaluation and discipline standards" and (ii) "engaged in acts of comparable seriousness but were not punished as severely as [the] plaintiff." *Id.* (citing *Graham*, 230 F.3d at 40).

In the Amended Complaint, Plaintiff raises a disparate treatment claim. Am. Compl. ¶¶ 69-75; *id.* ¶ 70 (alleging that Plaintiff "was treated more harshly than white employees similarly situated to Plaintiff"). However, Plaintiff provides no evidence pertaining to similarly situated white employees, let alone a "reasonably close resemblance of facts and circumstances." *Risco*, 868 F. Supp. 2d at 100; *see generally* Anderson Aff. Furthermore, Mr. Anderson proffers no evidence of white employees who were alleged to have caused a work stoppage and were not terminated by Phoenix. To the contrary, Phoenix has provided copies of arbitral decisions in two instances where other Phoenix employees caused work stoppages and the arbitrator concluded that Phoenix had just cause to terminate them. Dkt. Nos. 81-14 & 81-15 (Arbitrator Awards).[13] Under such circumstances, I cannot conclude that Mr. Anderson has established disparate treatment as a basis for inferring that unlawful racial discrimination accounted for his discharge.

---

[13]     Phoenix has represented that these two former employees were Caucasian and Hispanic, respectively. Dkt. No. 81-1 (Memorandum in Support), at 17. However, Phoenix has not provided any admissible evidence supporting this assertion, so I do not consider those facts specifically, just the fact that two other employees were found to be terminated for just cause due to an unlawful work stoppage.

*See, e.g.*, *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 495 (2d Cir. 2010) ("Because [plaintiff] has not identified a similarly-situated employee who faced equally serious allegations and whom [defendant] allowed to remain on the job, [plaintiff] has failed to raise an inference of discrimination.").

It is a closer call regarding whether Mr. Anderson can establish the requisite inference by pointing "to some direct evidence that creates a genuine issue of fact as to whether [his] termination was motivated by racial bias or animus." *Risco*, 868 F. Supp. 2d at 104. In other words, evidence of discriminatory statements may suffice, but only if a plaintiff demonstrates that a nexus exists between those statements and the adverse employment decision. *McAllister v. Price Rite*, 2013 WL 5187036, at *8 (D. Conn. Sept. 13, 2013); *accord Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 259 (E.D.N.Y. 2005). Here, Mr. Anderson has failed to make such a showing.

The Second Circuit has used the term "stray remark" to refer to certain comments that do not evince an adverse action motivated by discrimination because of how "remote and oblique the remarks are in relation to the employer's adverse action." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Courts have utilized the following factors to determine whether a certain comment was a "stray remark":

> (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level coworker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

*McAllister*, 2013 WL 5187036, at *8 (quoting *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007)) (internal quotation marks omitted). The purpose of this analysis is to "assess the remarks' tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Id.* (internal quotation marks and citation omitted).

First, the only racially discriminatory comments directed toward Mr. Anderson were made by individuals who were not involved in the decision to terminate him. *See Stepheny*, 356 F. Supp. 2d at 259-60. The decision to terminate Mr. Anderson, particularly because he was a shop steward, would have been made by senior executives at Phoenix, including Mr. Crowley and Phoenix's "executive team." Ruiz Tr. at 123:7-23. Mr. Ruiz had some involvement in this decision; Mr. Ruiz testified that he spoke to Mr. Crowley but stated that he did not give a recommendation as to what should be done after the incident. *Id.* at 123:24-125:8.[14] Thus, the alleged discriminatory comments by Messrs. Carter, Cassano, Guttman, and Leone, who were subordinate to Mr. Ruiz, are attenuated from the decision to terminate Mr. Anderson. In fact, of the supervisors alleged to have directed racially derogatory language toward Mr. Anderson, only Mr. Guttman was even present when the events leading to Mr. Anderson's termination occurred, and he was one of numerous witnesses and at least one layer of authority removed from being the "ultimate decision-maker" regarding Mr. Anderson's termination. Accordingly, this factor weighs against the conclusion that racial animus was connected to the adverse employment action suffered by Mr. Anderson. *Cf. Holcomb*, 521 F.3d at 143 (summary judgment improper

---

[14]     At his deposition, Mr. Crowley did not recall who was involved in the decision to terminate Mr. Anderson. Crowley Tr. at 80:22-83:7. Mr. Crowley suggested that Mr. Battle, Mr. Ruiz, Rod Brayman, and Mr. Crowley "possibly discussed this whole thing. . . . Who fired who or when, I don't know," and continued, "Oscar [Ruiz] was possibly—," without finishing his thought. *Id.* at 81:23-82:9. Mr. Crowley also testified that "union related disciplines" were generally "handled by [Mr. Ruiz]," and "finalized by Rod [Brayman] or I." *Id.* at 86:4-9. Mr. DiFranco, though not personally involved, stated that he thought Mr. Ruiz would have been involved in some way. DiFranco Tr. at 90:25-91:19. Drawing all inferences in favor of Mr. Anderson at this stage, I conclude that Mr. Ruiz was involved in discussing the circumstances leading to Mr. Anderson's termination, even if he did not necessarily make the decision himself.

because of "ample evidence" that speakers of racially motivated language "played a meaningful role in the decision to terminate [the plaintiff]").[15]

Furthermore, although the comments described at length above could certainly be viewed as odious and discriminatory by a reasonable juror—meaning that the third factor weighs in favor of a connection between racial animus and Mr. Anderson's termination—the comments were not made in relation to Mr. Anderson's termination and were not related to the decision-making process. *McAllister*, 2013 WL 5187036, at *9; *see White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) (summary order). Rather, the alleged derogatory comments were almost exclusively made months and years before Mr. Anderson was terminated, constituting the "kind of isolated and stray remark[s] insufficient, without more, to raise an inference of discrimination and defeat summary judgment." *Muse v. New York City Dep't of Hous. Pres. & Dev.*, 2000 WL 1209427, at *4 (E.D.N.Y. Aug. 22, 2000). Besides Mr. Cassano's unspecified racially derogatory remarks "[o]n or about October 29, 2008" (Anderson Aff. ¶ 37), there are no specific instances of allegedly derogatory language proffered by Mr. Anderson within approximately eight months of his termination, the same period of time in *Muse* that led to the conclusion that such "isolated and stray remark[s]" did not suffice to raise an inference of discrimination. *Muse*, 2000 WL 12094247, at *4.

In short, reviewing the complete record and considering the evidence in the totality of the circumstances, no reasonable jury could infer that racial discrimination was a motivating factor

---

[15]      There is no allegation of and no evidence to support a theory of "cat's paw" liability, which occurs in a situation where "an employee is fired . . . by a supervisor who himself has no discriminatory motive but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Servs., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016).

behind Mr. Anderson's termination. At bottom, the evidence demonstrates that the alleged

discriminatory language is too attenuated from Mr. Anderson's termination, in three key ways.

First, the alleged speakers of the derogatory language were several organizational steps

removed from the ultimate decision to terminate Mr. Anderson's employment, and there is no

allegation or evidence that the ultimate decision-makers harbored any discriminatory animus

toward Mr. Anderson. *See Risco*, 868 F. Supp. 2d at 105. Second, the specific instances of

alleged racist abuse are too attenuated in time from Mr. Anderson's termination to permit an

inference of discriminatory motive. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 540-41 (E.D.N.Y.

2014) (citing cases); *cf. Gorzynski*, 596 F.3d at 110 ("Though this Court has not drawn a bright

line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal

relationship is too attenuated to establish causation, we have previously held that five months is

not too long to find the causal relationship.").[16]

Finally, the alleged racially derogatory comments themselves were unrelated to the

termination decision. *See Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d

529, 537 (E.D.N.Y. 2006), *aff'd*, 245 F. App'x 42 (2d Cir. 2007) (summary order). I conclude

that despite the fact that they are clearly hurtful and odious statements, the alleged derogatory

comments suffered by Mr. Anderson are no more than "stray remarks" bearing no nexus to his

---

[16]     To the extent that Plaintiff relies on Mr. Cassano's alleged derogatory language on or
about October 29, 2008, I am not persuaded that the analysis differs. Mr. Cassano was not the
"ultimate decision-maker" regarding Plaintiff's termination and, indeed, had no role in the events
leading to the alleged work stoppage and Plaintiff's termination. Furthermore, in his affidavit,
Plaintiff focuses on the alleged retaliatory animus expressed by Mr. Ruiz once he is informed of
Mr. Cassano's alleged language; merely referring to Mr. Cassano's "racially derogatory
remarks," without more, is too conclusory to support a finding that Mr. Cassano exhibited racial
animus toward Plaintiff. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a
party to defeat a motion for summary judgment by offering purely conclusory allegations of
discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

termination. Accordingly, no reasonable jury could conclude that Mr. Anderson has established an inference of discrimination as part of his prima facie claim of racial discrimination. *Adam v. Glen Cove Sch.*, 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008) ("[S]tray remarks by these non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination."); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of [even] a decision-maker, without more, cannot prove a claim of employment discrimination[.]") (citation omitted); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of [the] decision."). Therefore, I respectfully recommend that summary judgment be granted on Mr. Anderson's claim of racial discrimination for failure to establish a prima facie claim.

### 2. Legitimate, Nondiscriminatory Reason

Assuming *arguendo* that Mr. Anderson established a prima facie case of racial discrimination, I turn to the next prong of the *McDonnell Douglas* framework. If a plaintiff establishes a prima facie case of racial discrimination, then the burden shifts to the defendant employer to provide a legitimate, nondiscriminatory reason for the action. *Holcomb*, 521 F.3d at 138. Here, Phoenix has provided a legitimate, nondiscriminatory reason for terminating Mr. Anderson: namely, he caused an unauthorized work stoppage on November 7, 2008, in violation of the 2004 CBA.

Phoenix has presented sufficient evidence of the work stoppage. As several witnesses testified at their depositions, Mr. Anderson returned to the warehouse after hours and held a meeting without receiving permission to hold such a meeting at that time. DiFranco Tr. at 80:22-

81:8; Guttman Tr. at 201:6-25; Ruiz Tr. at 108:18-109:9. The meeting lasted approximately 30 minutes, during which time employees were not working as they were supposed to be. *See* Anderson Aff. ¶ 44 ("I was escorted out of the Warehouse approximately 30 minutes after I arrived[.]"). Mr. Anderson even admits that he returned to the Phoenix warehouse and did not secure permission that evening to meet with employees and stop their work. Anderson Aff. ¶¶ 39-41.

It is undisputed that the 2004 CBA prohibits a shop steward from "tak[ing] strike action, slowdowns, sick outs or any other action interrupting [Phoenix's] business," and that Phoenix has "the authority to impose proper discipline, including discharge, in the event the [shop] steward has taken unauthorized strike action, slowdown, and sick out or work interference in violation of this [CBA]." 2004 CBA, art. 22. Mr. Anderson's meeting with Phoenix employees on November 7, 2008 resulted in a work stoppage that interfered—albeit temporarily—with Phoenix's business. Accordingly, I conclude that Phoenix has articulated a legitimate, nondiscriminatory reason to terminate Mr. Anderson's employment.

### 3.    Proof of Racial Discrimination

Once a legitimate, nondiscriminatory reason is established, the Court proceeds to the "ultimate question" of whether the plaintiff has presented sufficient evidence from which a reasonable jury could find race discrimination. *Rommage v. MTA Long Island R.R.*, 2010 WL 4038754, at *8 (E.D.N.Y. Sept. 30, 2010). The "ultimate question" is whether the employer intentionally discriminated, and it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination. *Reeves*, 530 U.S. at 146-47.

To defeat an employer's motion for summary judgment at this stage, therefore, the plaintiff must demonstrate that there is a material issue of fact as to whether (i) the employer's

asserted reason for discharge is false or unworthy of belief, and (ii) it is more likely than not that plaintiff's race was the real reason for the discharge. *Rommage*, 2010 WL 4038754, at *8. Here, Mr. Anderson has not provided sufficient evidence to create such an issue of fact.

Fundamentally, there is no issue of fact as to whether Mr. Anderson was validly terminated for his causing a work stoppage on November 7, 2008. In addition to the testimony of Phoenix employees at their depositions and Mr. Anderson's admission that he held a meeting that evening, Phoenix's decision to terminate Mr. Anderson was also the subject of an arbitration proceeding where the arbitrator held that Mr. Anderson's termination was justified.  As Judge Irizarry wrote in *Rommage*:

> Although the arbitration decision is not inherently conclusive, it is relevant evidence of a lack of discriminatory intent. "Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive. . . . [A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link."

*Rommage*, 2010 WL 4038754, at *11 (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 115, 119 (2d. Cir. 2002)).

In *Collins*, the plaintiff appealed the entry of summary judgment dismissing his claims of race-based and retaliatory termination, but the Second Circuit affirmed in large part because of the arbitral decision. 305 F.3d at 115. The plaintiff had a long disciplinary history—including alleged threats to injure his supervisor and his supervisor's family and a criminal conviction for disorderly conduct after allegedly punching the supervisor in the face—by the time of his termination. *Id.* at 115-18. The plaintiff filed a grievance against his employer pursuant to a CBA and was represented by his union at an arbitration, which was followed by an arbitral opinion

finding that the plaintiff had physically assaulted his supervisor and upholding the plaintiff's termination. *Id.* at 117.

Turning to the effect of the "reasoned fourteen-page" arbitral opinion, the Second Circuit noted that the plaintiff did not challenge the independent, unbiased arbitration board, and did not claim that the board "rubber-stamped" the recommendations of the agency in upholding his termination. *Id.* at 118-19. Accordingly, the arbitral decision "based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination," was "highly probative of the absence of discriminatory intent in that termination." *Id.* at 119. The plaintiff therefore "offered insufficient evidence of causation linking his termination to motives of retaliation or discrimination to overcome the cumulative probative weight of the evidence of a legitimate reason for his discharge and of the final termination decision by the arbitration board." *Id.* (citations omitted).

Thus, in affirming the grant of summary judgment against the plaintiff, the Second Circuit pronounced the following rule, which is binding on this Court today:

> In sum, a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee. However, a decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g., new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised.

*Id.* (citation omitted).[17]

---

[17]    While *Collins* itself applies this rule to the analysis of causation in the prima facie case of discrimination, it just as easily applies to the third step of the *McDonnell Douglas* framework. As the Second Circuit noted in *Collins*, these two issues "tend to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins*, 305 F.3d at 118 n.1. "Arguably, *Collins*' rationale fits better in the third *McDonnell-Douglas* step because in testing a plaintiff's prima facie case, the Court is generally confined to evidence that the plaintiff offers, and a plaintiff will rarely

In *Rommage*, Judge Irizarry applied *Collins* in similar circumstances to this case. In that case, the Court granted summary judgment dismissing a plaintiff's claims of discrimination based on race, gender, age, and retaliation in connection with her termination. 2010 WL 4038754, at *8-16. In analyzing the plaintiff's claims based on race and gender discrimination and retaliation, Judge Irizarry concluded that the plaintiff failed to establish pretext as required under Title VII and that an arbitral decision upholding the plaintiff's termination was "highly probative" and "relevant evidence" of the absence of discriminatory intent at the third stage of the *McDonnell Douglas* framework. *Id.* at *11-12, *16.

A similar result follows here. The 18-page Arbitration Decision was based upon two days of hearings—where each side presented evidence and witnesses and was represented by counsel—and post-hearing briefs. *See generally* Arbitration Decision. Mr. Anderson vigorously argues that no evidence of racial discrimination (or retaliation) was presented at arbitration, and moreover, that he could not have presented such evidence.[18] *See Rommage*, 2010 WL 4038754, at *12 (plaintiff "admits that the arbitration was not biased," but she "contends, however, that the arbitration decision was wrong as a matter of fact because it did not consider any evidence of discrimination."). This argument is unpersuasive for the reasons described in *Rommage*.

---

offer an adverse arbitration decision as part of his prima facie case." *Hernandez v. Coca Cola Refreshments USA, Inc.*, 2013 WL 6388654, at *9 n.6 (E.D.N.Y. Dec. 6, 2013).

[18]    On April 5, 2017, Mr. Anderson filed a motion for leave to file a supplemental declaration. Dkt. No. 102. At the oral argument on this case on April 13, 2017, I granted that motion. Dkt. No. 104 (Oral Argument Transcript) ("Oral Argument Tr."), at 83:24-25. The supplemental declaration attaches a position statement taken by the Union on behalf of Mr. Anderson in a different arbitration proceeding, which notes that Phoenix "specified that it only heard one (1) grievance at a time." Dkt. No. 102-2 (Statement of Position) at 2 of 5; *see also* Dkt. Nos. 106 (Letter) & 107 (Motion for Leave to File Declaration). While this is somewhat probative of the procedure that led to the Arbitration Decision analyzed here, as discussed below, I conclude that a policy of hearing one "grievance" at a time does not imply that a grievant like Mr. Anderson could not raise evidence (*i.e.*, of racial discrimination) that is directly relevant to the charge being grieved (*i.e.*, whether the employee was terminated for just cause).

As Judge Irizarry noted in *Rommage*, numerous cases in this Circuit have applied *Collins* and accorded weight to arbitral decisions in situations where, for whatever reason, no evidence of discrimination (or retaliation) was raised at the arbitration. *E.g.*, *Rodriguez v. Long Island Am. Water, Inc.*, 2014 WL 4805021, at *12 (E.D.N.Y. Sept. 26, 2014) ("Although the Court, in analyzing what weight to give the arbitrator's decision, should consider whether the plaintiff's discrimination claim and purported evidence in support of that claim were specifically presented to the arbitrator, the failure to present that claim and/or evidence does not mean that the decision has no weight."); *Hernandez*, 2013 WL 6388654, at *10 n.7 ("Plaintiff has complaints about the way his union-appointed lawyer handled his representation at the arbitration hearing, particularly in failing to advise him that he could have asserted his discriminatory retaliation claim, but that is of no moment in this action."); *Spell v. United Parcel Serv.*, 2012 WL 4447385, at *2 (E.D.N.Y. Sept. 25, 2012) ("[T]he law is clear that [plaintiff's] failure to raise his discrimination claims before the arbitration is 'immaterial' to whether the arbitral determination should be given substantial weight."); *Rommage*, 2010 WL 4038754, at *12 ("[T]he fact that the arbitrator did not hear plaintiff's discrimination claims does not discount the arbitrator's findings."); *Gallimore-Wright v. Long Island R.R.*, 354 F. Supp. 2d 478, 492-93 (S.D.N.Y. 2005) ("There is no suggestion in *Collins* that the plaintiff had presented his evidence of discriminatory and retaliatory intent to the arbitrator. . . . [But *Collins*'] point was that the arbitration decision finding that the plaintiff . . . was properly terminated was strong evidence of a lack of retaliatory or discriminatory intent[.]").[19]

---

[19]     The parties briefed the narrow issue of whether the reference in *Collins* to "new evidence" meant newly discovered evidence or simply evidence that was not before the arbitrator. *See* Dkt. No. 82 (Memorandum in Opposition), at 13-15; Dkt. No. 85 (Reply Memorandum), at 4-8. The parties' references to that phrase in disparate factual situations and procedural postures are not persuasive, but I note that it is not settled whether "new evidence"

The facts of this case require no different outcome. Even if Mr. Anderson and his counsel believed that only "one (1) grievance" could be raised at the arbitration (*see* Anderson Aff. ¶ 49), the "one (1) grievance" before the arbitrator was: "Did [Phoenix] have just cause to discharge the Grievant, Walter Anderson? If not, what shall be the remedy?" Arbitration Decision at 2. In this context, any evidence of a racial (or retaliatory) animus giving rise to Mr. Anderson's termination would be highly relevant to the arbitrator's determination. Whatever his reason for not doing so, Mr. Anderson "necessarily had information and incentive to [provide evidence to the arbitrator] about any alleged discriminatory motives." *Halstead v. New York City Transit Auth.*, 2002 WL 34438897, at *8 (E.D.N.Y. Dec. 30, 2002), *aff'd*, 78 F. App'x 750 (2d Cir. 2003) (summary order).

Ultimately, regardless of the reason why Mr. Anderson did not raise racial discrimination at his arbitration hearing, the evidence adduced here is insufficient to render meaningless the reasoned decision reached by the arbitrator. To conclude otherwise would create a perverse incentive where an employee grieving a dispute with his employer could intentionally and strategically decline to raise certain evidence during arbitration in order to preserve a future attack on the arbitral decision by raising purportedly "new" evidence. Such a situation is

---

includes evidence that could have been presented in arbitration but was not. *Compare Reddick v. Niagara Mohawk Power Co.*, 2010 WL 5185098, at *10 (N.D.N.Y. Dec. 16, 2010) (evidence before court on motion for summary judgment not "new" because it was not "previously unavailable" but rather a transcript of a conversation from "almost a year before the arbitration hearings commenced"), *with Petrovits v. New York City Transit Auth.*, 2003 WL 22349676, at *4 (S.D.N.Y. Oct. 15, 2003) (declining to overrule jury verdict in favor of employee alleging sex discrimination in denial-of-promotion case when evidence of discrimination was not presented to arbitrator). It suffices to say that I concur with the majority of cases on this topic, such as those cited above, indicating that the Court should accord weight to arbitral decisions even if no evidence of discrimination (or retaliation) was raised at the arbitration. The Arbitration Decision here bears weight in support of the grant of summary judgment on the racial discrimination and retaliation claims; it does not preclude these claims.

incompatible with the "national policy" favoring arbitration and the enforcement of arbitral awards by state and federal courts. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008); *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Therefore, the Arbitration Decision concluding that Mr. Anderson caused an unauthorized work stoppage and was terminated for just cause attenuates an inference of racial discrimination here.

The Arbitration Decision only provides further support for the conclusion that Mr. Anderson's termination was not due to racial discrimination. Here, as discussed above, Mr. Anderson's evidence of racial discrimination is not sufficiently connected to the termination. There is no evidence that any of the ultimate decision-makers responsible for the decision to terminate Mr. Anderson were motivated to do so by any racial (or retaliatory) animus. Furthermore, the events leading to Mr. Anderson's termination transpired months, if not years, after the specific instances of racial discrimination that Mr. Anderson alleges. In short, Mr. Anderson has failed to present sufficient evidence from which a reasonable jury could find that Phoenix's asserted reason for his termination is false or unworthy of belief or that it was more likely than not that Mr. Anderson was terminated for racially discriminatory reasons. *Rommage*, 2010 WL 4038754, at *8-13. I would reach this conclusion even if no weight was accorded to the Arbitration Decision because "there is insufficient evidence in the record for a rational jury to conclude that [Phoenix's] termination decision was a pretext for race discrimination." *Rodriguez*, 2014 WL 4805021, at *13.

I conclude that even if a reasonable jury made all inferences in favor of Mr. Anderson, it could not find that Mr. Anderson has established a prima facie case of racial discrimination or that Phoenix's legitimate reason for his termination was a pretext for intentional discrimination.

Accordingly, I respectfully recommend that Phoenix's motion for summary judgment be granted as to Mr. Anderson's claim of racial discrimination.

### D.      Retaliation Claim

"The antiretaliation provision [of Title VII] seeks to secure [its] primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII]'s basic guarantees." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 63. Title VII provides that an employer may not "discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *Littlejohn*, 795 F.3d at 315-16. If a plaintiff successfully establishes a prima facie case of retaliation, then the familiar *McDonnell Douglas* framework described above is also applied. *Hicks*, 593 F.3d at 164.

"Despite the elaborate process set up in *McDonnell Douglas*, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." *Rommage*, 2010 WL 4038754, at *8 (quoting *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 199 (E.D.N.Y. 2009)); *accord Prophete-Camille v. Stericycle, Inc.*, 2017 WL 570769, at *11 (E.D.N.Y. Feb. 13, 2017). I assume for the purposes of this analysis that Mr. Anderson has established a prima facie claim for retaliation regarding his complaints of racially derogatory

language. As discussed above, Phoenix has demonstrated a legitimate, nondiscriminatory reason for Mr. Anderson's termination: namely, that Mr. Anderson caused a work stoppage on November 7, 2008 when he held an impromptu meeting with employees in the middle of their shift, in violation of the relevant CBA. Therefore, I will proceed to the third stage of analysis under the *McDonnell Douglas* framework.

The Supreme Court has held that unlike other discrimination claims, a Title VII retaliation claim "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). "Therefore, during the final stage of the burden shifting framework, the plaintiff must show that retaliation was a but-for cause of the adverse employment action. . . . In order to establish but-for causation, Plaintiff would have to prove that [the adverse employment action] would not have occurred in the absence of a retaliatory motive." *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 195-96 (E.D.N.Y. 2013) (citations omitted).

Because of *Nassar*, Mr. Anderson's retaliation claim is doomed by the Arbitration Decision to a greater extent than his racial discrimination claim is. Standing alone, Mr. Anderson's statement that he complained to Mr. Ruiz about Mr. Cassano using derogatory language and that Mr. Ruiz responded by telling Mr. Anderson that "I'm going to get rid of you one of these days" some ten days before Mr. Anderson was terminated (Anderson Aff. ¶ 37) is a disputed material fact that would allow a reasonable jury to find an inference of retaliation. However, the elevated standard pronounced in *Nassar* prevents the Court from reaching this conclusion and denying the motion for summary judgment.

The Second Circuit has discussed *Nassar* and the application of but-for causation to retaliation claims under Title VII. In *Kwan v. Andalex Grp. LLC*, the Second Circuit reaffirmed that a plaintiff "must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." 737 F.3d 834, 845 (2d Cir. 2013) (citing *Nassar*, 133 S.Ct. at 2526, 2533). In other words, "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. While the Second Circuit has noted that there can be multiple "but-for" causes of an adverse employment action and that such an analysis in the context of retaliation is particularly ill-suited for summary judgment (*id.* at 846 n.5), these concerns do not prevent a grant of summary judgment here. The principal reason is the Arbitration Decision.[20]

The Arbitration Decision explicitly concluded that Phoenix had just cause to terminate Mr. Anderson. The arbitrator did not consider any evidence of racial discrimination or retaliation in reaching his decision, but it therefore follows from the very nature of the arbitrator's conclusion that the termination was valid and would have occurred in the absence of a retaliatory

---

[20]     At oral argument, Plaintiff raised *Kwan* as a case explaining the limitations of the "but-for" causation standard in *Nassar. See* Oral Argument Tr. at 41:15-42:1. In *Kwan*, the Second Circuit vacated summary judgment dismissing retaliation claims and noted that "but-for" causation requires "only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment decision by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* This case is distinguishable from *Kwan*. In *Kwan*, the employer proffered "shifting and somewhat inconsistent explanations for [plaintiff's] termination" (*id.*), while Phoenix here has stood by its single explanation of Mr. Anderson's termination—that he caused an unauthorized work stoppage. Even more significantly, the evidence of pretext in *Kwan* was full of "discrepancies" from which "a reasonable juror could infer that the explanations given by [the employer] were pretextual" (*id.* at 847), whereas in this case an independent and unbiased arbitrator held two days of hearings, heard testimony from numerous witnesses, and issued a thorough 18-page decision endorsing Phoenix's justification for Mr. Anderson's termination.

(or discriminatory) motive. *Cf. id.* at 846. Accordingly, if the Court accords any weight to the Arbitration Decision, then Mr. Anderson will be unable to prove that retaliation was a "but-for" cause of his termination.

For substantially the same reasons as described in the discussion of the Arbitration Decision's applicability to Mr. Anderson's claim of racial discrimination, I conclude that the Arbitration Decision bears weight as to the retaliation claim. Under *Collins* and *Rommage*, and for the policy reasons outlined above, I therefore find that the Arbitration Decision "'is highly probative of the absence of discriminatory intent' and 'will attenuate a plaintiff's proof of the requisite causal link' between the termination and the protected activity." *Rommage*, 2010 WL 4038754, at *16 (quoting *Collins*, 305 F.3d at 119). Of course, the rationale in *Rommage* is even more compelling here because the subsequent pronouncement in *Nassar* elevated the standard to require a plaintiff to prove that a retaliatory motive was a "but-for" cause of the adverse employment action rather than a significant or motivating factor in the action. *Nassar*, 133 S.Ct. at 2526, 2533; *Kwan*, 737 F.3d at 845. In light of the Arbitration Decision made by "an independent and unbiased arbitrator based on substantial evidence after a fair hearing" (*Collins*, 305 F.3d at 115), Mr. Anderson's proffered evidence of retaliation is insufficient to permit a reasonable jury to conclude that but for retaliation, Mr. Anderson would not have been terminated. Therefore, I respectfully recommend that Phoenix's motion for summary judgment be granted as to Mr. Anderson's retaliation claim.

## V.   MOTION FOR SANCTIONS

Phoenix has also moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure on the basis of Mr. Anderson's allegedly frivolous and contrived claims and purported lack of evidence of wrongdoing.

To avoid Rule 11 sanctions, a party's counsel must conduct a reasonable inquiry to ensure that his filings are "well-grounded in fact, legally tenable, and not interposed for any improper purpose." *Young v. Suffolk Cty.*, 922 F. Supp. 2d 368, 396 (E.D.N.Y. 2013). The Court must apply an objective standard of reasonableness in evaluating a sanctions motion. *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 73 F.3d 1253, 1257 (2d Cir. 1996); *accord Dagostino v. Computer Credit, Inc.*, -- F. Supp. 3d --, 2017 WL 776086, at *10 (E.D.N.Y. Feb. 28, 2017). "For example, Rule 11 is violated 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents.'" *Sorenson v. Wolfson*, -- F. App'x --, 2017 WL 1043073, at *1 (2d Cir. Mar. 16, 2017) (summary order) (citation omitted); *accord Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012). But "'[s]anctions are not to be imposed for unsuccessful litigation of a cognizable claim.'" *Sorenson*, -- F. App'x --, 2017 WL 1043073, at *1 (quoting *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 454 (2d Cir. 1987)).

Here, sanctions are unwarranted. It is undisputable that the parties and their counsel have expended a lot of time and effort (and in Phoenix's case, money) to litigate the issues in this case. However, nothing that Plaintiff or his counsel has done is objectively unreasonable such that the Court should, in its discretion, impose sanctions.

Throughout its sanctions briefing and the oral argument, Phoenix's counsel assailed Mr. Anderson's character and implied that only improper motives could have led to the continuation of this lawsuit. *See, e.g.*, Oral Argument Tr. at 8:24-9:2 ("[W]e . . . view this case as something which any lawyer would have realized was a frivolous case and that Mr. Anderson was a prolific liar."); *id.* at 17:21-24 ("[T]hat amended complaint . . . is a contrivance, this is a fabrication, this is a lie"); *id.* at 33:4 ("This guy's a born liar."); *see generally* Dkt. No. 91 (Memorandum in

Support of Sanctions); Dkt. No. 94 (Reply Memorandum). Phoenix's factual allegations are simply insufficient to support the imposition of sanctions. Phoenix repeatedly points to the long procedural history of this case, past transgressions and seeming untruths by Mr. Anderson, and its management's deposition testimony to demand that the Court find Mr. Anderson's allegations and testimony not credible as a matter of law. As discussed at the oral argument (*see* Oral Argument Tr. at 47:5-12) and as made clear in my recommendation above, this is not the Court's role at the summary judgment stage. *Reeves*, 530 U.S. at 150 (upon motion for summary judgment, "'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'") (citations omitted). Mr. Anderson has sworn to the truth of his affidavit, and a reasonable jury reviewing Mr. Anderson's affidavit, the affidavit of Juan Beltre, and the testimony of numerous supervisors and executives at Phoenix could conclude that Mr. Anderson's allegations of a hostile work environment are true.[21]

Mr. Anderson's other legal arguments are also objectively reasonable, even where unpersuasive or unsuccessful. First, Phoenix repeatedly contends that the Supreme Court decision in *14 Penn Plaza* precludes the instant lawsuit and Mr. Anderson's counsel should have known to withdraw the Amended Complaint. *See* Dkt. No. 81-1 (Memorandum in Support of Summary Judgment), at 19-22; Dkt. No. 85 (Reply Memorandum), at 9; Dkt. No. 91 (Memorandum in Support of Sanctions), at 23-24; Dkt. No. 94 (Reply Memorandum), at 8-9. As

---

[21]   At oral argument, Phoenix's counsel likened the "collegial" atmosphere of the Phoenix warehouse to that of counsel's law firm. Oral Argument Tr. at 30:20-31:3. Such a statement is undermined by Plaintiff's allegations and deposition testimony from other employees about ubiquitous "street talk" on the warehouse floor (*e.g.*, Perdue Tr. at 63:4-11; Guttman Tr. at 110:12-111:22). While a lawyer should zealously represent his client, it is inappropriate to move for sanctions at the summary judgment stage on the basis of a client's version of facts while completely discounting the opposing party's sworn statement and any testimony to the contrary.

addressed above, not only is this argument incorrect, it runs counter to a decision reached in our sister District rejecting the identical argument by Phoenix about the same CBA provisions in a case brought against Phoenix-related entities in which defense counsel was the same as in this case. *See Fernandez*, 159 F. Supp. 3d 351. Phoenix's counsel at oral argument stated that he "disagree[d]" with the decision in *Fernandez* (Oral Argument Tr. at 21:24-25), but it is inconceivable that defense counsel can argue for sanctions on the basis of a purportedly frivolous legal argument by Plaintiff when persuasive authority within this Circuit is directly on point, is directly contrary to defense counsel's argument, and, indeed, was issued only months ago in a case in which the same defense counsel appeared.

Second, Phoenix argues that Mr. Anderson's counsel should have known that the Arbitration Decision would weigh against Mr. Anderson's racial discrimination and retaliation claims in connection with his termination. Dkt. No. 91 (Memorandum in Support of Sanctions), at 22-23; Dkt. No. 94 (Reply Memorandum), at 7-8. While I have concluded that weight should be accorded to the Arbitration Decision in these circumstances, it is far from unreasonable for Mr. Anderson's counsel to argue that it should not. Numerous pages of briefing, a significant portion of the oral argument lasting longer than two hours, and lengthy discussion in this very opinion illustrate that questioning the proper weight of the Arbitration Decision is proper and that deciding the issue is not straightforward. Phoenix's arguments to the contrary are wholly unavailing.

In short, nothing that Phoenix has proffered supports the imposition of sanctions here. Phoenix's frustration with the amount of time, money, and effort expended is evident, and Phoenix's counsel has zealously adopted his client's view of the facts in this case and of Mr. Anderson as a person. It is possible that Phoenix is right about the facts; if this case were to go to

trial, it is possible that Mr. Anderson's credibility would be destroyed and his allegations would be swallowed up by an avalanche of evidence. Furthermore, Phoenix has raised strong legal arguments about the Arbitration Decision and Mr. Anderson's work environment, some of which this Court has found persuasive. Ultimately, however, none of this merits the imposition of sanctions. None of the evidence or arguments presented by Mr. Anderson's counsel is frivolous or raised in bad faith, and the Court may not entertain credibility determinations at the summary judgment stage. Accordingly, I respectfully recommend that the Court deny Phoenix's motion for sanctions.

## VI.    CONCLUSION

For the reasons identified above, I respectfully recommend that the motion for summary judgment filed by defendant Phoenix Beverages, Inc. be granted in part and denied in part. In particular, I respectfully recommend that the motion for summary judgment be denied as to plaintiff Walter Anderson's hostile work environment claim and granted as to his racial discrimination and retaliation claims. I further recommend that the motion for sanctions filed by Phoenix Beverages, Inc. be denied.

## VII.   OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____

Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Brooklyn, New York
       July 17, 2017