UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
WALTER L. ANDERSON,                              12-CV-1055 (DLI) (ST)
:
        Plaintiff,
:
- against-
:

PHOENIX BEVERAGES, INC                           :

        Defendant.    :
------------------------------------------------------------x


# PLAINTIFF'S OBJECTIONS TO
# MAGISTRATE JUDGE TISCIONE'S REPORT AND RECOMMENDATION
# ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


LINCOLN SQUARE LEGAL SERVICES, INC.
150 West 62nd Street, 9th Floor
New York, NY 10023
212-636-6934

Attorney for Plaintiff, Walter L. Anderson

By:   Michael W. Martin, Esq.
        Ian Weinstein, Esq.
        Nathaniel Black, Legal Intern
        Nicole Sauer, Legal Intern

July 31, 2017

**TABLE OF CONTENTS**

Introduction....................................................................................................................................1

I. THE R&R ERRS IN CONCLUDING THAT NO REASONABLE JURY COULD FIND MR. ANDERSON'S TERMINATION OCCURRED UNDER CIRCUMSTANCES GIVING RISE TO AN INFERENCE OF DISCRIMINATION ..................................................................2

    A. This Is Not A Stray Remarks Scenario ........................................................................3

        1. A Jury Could Reasonably Connect the Odious Comments to the Decision to Fire Mr. Anderson ...............................................................................................................................3

        2. A Jury Could Reasonably Find That Racially Derogatory Remarks Ten Days Prior to His Termination Support Liability………………………………………….………...….6

        3. A Jury Could Reasonably Find that the Racially Derogatory Comments Here Were Sufficiently Related to Phoenix's Termination Decision……………...………………..7

    B. The R&R Errs in Finding that No Reasonable Jury Could Find That The Alleged Work Stoppage Was Pretext for Mr. Anderson's Termination..………..….…………………….…9

        1. The Record Supports a Reasonable Finding that the Alleged Work Stoppage Was Pre-Text For Firing Mr. Anderson..………………......................…………..………10

        2.The R&R Errs in Giving the Arbitration Decision Great Weight………………..……12

II. A REASONABLE JURY COULD FIND THAT RETALIATION WAS THE "BUT-FOR" CAUSE OF MR. ANDERSON'S TERMINATION………………………………….…………15

Conclusion……………………………………………………………………….………………17

# **TABLE OF AUTHORITIES**

**Cases**

*14 Penn Plaza LLC v. Pyett,* 556 U.S. 247 (2009) .......................................................................... 14
*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001) ............................................... 1
*Collins v. New York Transit Auth.*, 305 F.3d 113 (2d Cir. 2002) ....................................... 9, 12, 15
*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010) ................................................... 7
*Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008) .................................................................. 5, 8
*Kwan v. Andalex Grp. LLC*, 737 F.3d 834 (2d Cir. 2013) ............................................................ 16
*McAllister v. Price Rite*, 2013 WL 5187036 (D. Conn. Sept. 13, 2013) ........................................ 8
*Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57 (1986) ........................................................... 4
*Muse v. New York City Dep't of Hous. Pres. & Dev.*, 2000 WL 1209427, (E.D.N.Y. Aug. 22, 2000) ............................................................................................................................................ 6
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .......................................... 1, 12
*Risco v. McHugh*, 868 F. Supp. 2d 75 (S.D.N.Y. 2012)) ................................................................ 2
*Rommage v. MTA Long Island Rail Rd.*, 2010 WL 4038754 (E.D.N.Y. Sept. 30, 2010) aff'd, 452 F. App'x 70 (2d Cir. 2012). ....................................................................................................... 9, 14
*Sethi v. Narod*, 12 F. Supp. 3d 505 (E.D.N.Y. 2014) ...................................................................... 7
*Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248 (E.D.N.Y. 2005) . 8
*Tomassi v. Insignia Fin. Grp.,* 478 F.3d 111 (2d Cir 2007) .................................................... 2, 4, 6
*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013) .................................................. 15
*Vance v. Ball State University*, 570 U.S. 133 S. Ct. 2434 (2013) .............................................. 4, 8
*Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267 (2d. Cir. 2016) ................................. 4

**Statutes**

Federal Rule of Civil Procedure 56 ............................................................................................ 1, 12
Federal Rule of Civil Procedure 72(b) ............................................................................................ 1

**Other Authorities**

Restatement (Third) of Agency, § 4.01, Am. Law Inst. 2006 ......................................................... 5

## Introduction

Mr. Walter Anderson submits these Objections to the Report and Recommendation of United States Magistrate Judge Steven L. Tiscione issued on July 17, 2017 ("R&R"), recommending the granting, in part, of the Defendant's Motion for Summary Judgment of Mr. Anderson's racial discrimination and retaliation claims, pursuant to Federal Rule of Civil Procedure 72(b).[1] The R&R resolves genuine issues of material fact to support the recommendation to grant dismissal of those two claims. Regarding the discrimination claim, it errs in concluding no reasonable jury could find that: 1) Mr. Anderson was terminated under circumstances giving rise to an inference of discrimination; and 2) the alleged work stoppage was pretext for Phoenix's firing Mr. Anderson because of his race. Concerning the retaliation claim, the R&R erroneously concludes that no reasonable jury could find that Phoenix's retaliatory motive was a "but-for" cause of its terminating Mr. Anderson. A factfinder must decide those factual issues, and the claims must not be dismissed as a matter of law.

At summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party. Fed. R. Civ. P. 56; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Additionally, in an employment discrimination case where the employer's motivation for taking an adverse employment action is at issue, the plaintiff's burden for meeting his *prima facie* case is *de minimis*. See *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

---

[1] The Court also recommended denial of the Defendant's motion for summary judgment on the hostile work environment claim, as well as denial of the defendant's motion for sanctions. As required by Fed. R. Civ. P. 72(b)(2), a copy of the transcript from the April 13, 2017 oral argument before United States Magistrate Judge Steven L. Tiscione is attached.

I. **The R&R Errs in Concluding that No Reasonable Jury Could Find Mr. Anderson's Termination Occurred Under Circumstances Giving Rise to an Inference of Discrimination**

The R&R ignores the reasonable narrative of discrimination a jury could infer from this record and isolates fact from context to support its erroneous conclusion that Mr. Anderson fails to meet his *prima facie* burden for illegal discrimination. R&R at 38-47. There is no reasonable dispute that Mr. Anderson was a member of a protected class, qualified for his job, and suffered an adverse employment action. R&R at 33-34. The sole *prima facie* issue is whether Mr. Anderson has advanced "some direct evidence that creates a genuine issue of fact as to whether [his] termination was motivated by racial bias or animus," an issue the R&R admits is a "closer call." R&R at 35 (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012)). Unfortunately, the R&R minimizes Mr. Anderson's evidence of racial bias in two steps, both of which miss the mark.

First, the Court misapplies the Second Circuit's "stray remark" line of cases. *See* R&R at 33-39. As developed below, while the law does not permit liability based on remote and oblique remarks by people not responsible for employment decisions, the Circuit has cautioned trial courts to view the whole record and not dismiss contextually discriminatory comments by mere labeling. *See Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007) (vacating dismissal that relied on stray remarks doctrine and noting importance of viewing each fact in the light of all the evidence at summary judgment).

Second, the Court minimizes and ignores record evidence from which a reasonable jury could infer that the asserted reason for Mr. Anderson's discharge is a pretext for racial animus. *See* R&R at 40-46. There is ample evidence from which a reasonable jury could conclude that racial animus motivated Mr. Anderson's termination. We address each of these two errors in turn.

2

### A. This Is Not A Stray Remarks Scenario

In this case, and against the teaching of *Tomassi*, the R&R concludes that the "odious and discriminatory" remarks found here were mere "stray remarks." by isolating fact from context to reach three erroneous findings: 1) those alleged to have made the racially charged comments were sufficiently removed from the decision to fire Mr. Anderson to vitiate liability; 2) the relationship between the derogatory comments and the firing was too attenuated in time to support an inference of connection; and 3) the derogatory comments were unrelated to the termination decision. R&R at 38. In these findings, the R&R strays into the jury's purview and resolves genuine issues of material fact, improperly drawing inferences in favor of the moving party. Considering the whole record, a jury could reasonably infer that Phoenix terminated Mr. Anderson under circumstances that suggest discrimination.

#### 1. A Jury Could Reasonably Connect the Odious Comments to the Decision to Fire Mr. Anderson

A reasonable jury could find that supervisors at Phoenix shared the racial animus to which lower level managers gave voice, on either of two mutually consistent theories. First, the record is replete with evidence supporting the inference that Mr. Ruiz and his superiors shared the racial animus expressed on the warehouse floor. Mr. Ruiz, who oversaw the entire warehouse operation, (*see* Ruiz Dep. at 26:6-27:25, ECF No. 81-11) admitted that, seven months before Mr. Anderson's termination, Mr. Guttman confessed to calling the 50-year-old Mr. Anderson "boy," but that Ruiz chose not to punish him. Ruiz Dep. at 66:22-67:5, ECF No. 81-11 (stating that Mr. Guttman called Mr. Anderson "boy"); *id.* at 73:21-25 (stating that after speaking with Mr. Guttman, Mr. Ruiz took no further action). Then, just ten days before Mr. Anderson's termination, Mr. Ruiz heard Mr. Anderson's claim that Mr. Cassano, a supervisor known for using racially charged language [cite], had made racially derogatory remarks to Mr. Anderson (*see* Anderson Aff. ¶ 37, ECF No. 84-1)—

3

a disputed fact that must be considered true for purposes of this motion. Again, Mr. Ruiz did not punish the perpetrator; rather, he threatened Mr. Anderson, the victim and complainant, with termination. *See id.* In the context of that warehouse, this failure to act on an affirmative duty and meet his responsibilities under the law gives rise to a reasonable inference of shared racial bias among some of the workers and their supervisor. Ten days later, Mr. Ruiz discussed Mr. Anderson with Mr. Rod Brayman, part owner of Phoenix, and Vice President Crowley. *See* Ruiz Dep. at 123:24-125:8, ECF No. 81-11. Later that day, Mr. Anderson was terminated. *See* Anderson Aff. ¶ 46, ECF No. 84-1. A reasonable jury could infer racial animus from this constellation of facts.

Second, the situation is also usefully illuminated by agency law, which ultimately governs employer liability for the acts of employees. See generally, *Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57, 72 (1986) (holding that agency principles govern a company's liability for acts of illegal discrimination by employees); *Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267, 269 (2d. Cir. 2016) (holding prejudice may be imputed in the adverse employment action context where supervisor permits himself to be used as conduit for subordinates' racial animus). Mr. Ruiz's statement, "I am going to get rid of you one of these days," coupled with years of inaction in the face of complaints about racial animus, are evidence that Phoenix decision makers shared and adopted its managers' racial bias. *See Tomassi*, 478 F.3d at 115.

Although there is no evidence that anyone above Mr. Ruiz made racially derogatory remarks, Vice President Crowley and other supervisors ignored Mr. Anderson's complaints for years. *See* Anderson Aff. ¶¶ 21-22, 37, ECF No. 84-1. An employer is not insulated from liability by formal silence and tacit encouragement. Agency law demands more. *See generally Vance v. Ball State University*, 570 U.S. 133 S. Ct. 2434, 2439 (2013) (employers can be liable for the discriminatory conduct of non-supervisory personnel when the employer is on notice and negligent in addressing the conduct); *Vasquez*, 835 F.3d at 269 (holding prejudice may be imputed in the

4

adverse employment action context where supervisor permits himself to be used as conduit for subordinates' racial animus). Principals are liable for their agents' statements when they affirmatively ratify them or when they are silent when most would speak. *See generally*, Restatement (Third) of Agency, § 4.01, Am. Law Inst. 2006 Ratification (discussing ratification by inaction in comment f).

Their inaction, in the face of notice of very bad conduct, gives rise to the inference that the continued misconduct of those workers either reflected the supervisors' sharing the animus or legal adoption of all its consequences. A reasonable jury could infer that Mr. Ruiz was the conduit, permitting and encouraging lower level employees, including managers, to express the animus that he and others shared, thereby doing his superior's bidding while providing them deniability. It is no leap to infer that his racial animus motivated his conduct when he discussed Mr. Anderson with his superior, John Crowley. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (finding evidence of a racially discriminatory motive to terminate despite organizational distance between one of those suspected of racial animus and those who made the decision to terminate).

The R&R also incorrectly credits Mr. Ruiz's claim that he offered no recommendation on Mr. Anderson's termination. R&R at 36. However, if—as it must for purposes of this motion—the R&R accepts Mr. Anderson's testimony as to Mr. Ruiz's threat to get rid of him just ten days before the termination, and Mr. Crowley's testimony about his reliance on Mr. Ruiz for advice in this sort of situation, discussed more fully below, *see infra at 7-8,* the R&R could not conclude—as it does—that a reasonable jury must credit Mr. Ruiz's claim that he played no role in the decision to terminate Mr. Anderson.

5

### 2. A Jury Could Reasonably Find That Racially Derogatory Remarks Ten Days Prior to His Termination Support Liability

Second, the racially derogatory comments were not too attenuated in time to the firing. Mr. Cassano made his racially derogatory comments to Mr. Anderson just ten days before the firing, (Anderson Aff. ¶ 37, ECF No. 84-1), an assertion the court must take as true for the purposes of the instant motion. The R&R asserts that Mr. Anderson's reference to "racially derogatory remarks" is "too conclusory to support a finding that Mr. Cassano exhibited racial animus towards Plaintiff." R&R at 38 n.16. Yet, this statement ignores ample evidence, confirmed by multiple third parties, that Mr. Cassano had a reputation for making such statements. *See, e.g.*, Anderson Aff. ¶ 18, ECF No. 84-1 (Phoenix supervisor Joseph Cassano (among other supervisors) regularly used racially derogatory remarks in the warehouse); Perdue Dep. at 61:12-63:23, ECF No. 81-10 (Supervisor Percy Perdue confirmed that Mr. Cassano regularly used racial slurs such as "Nigger" and "Boy" in the workplace, and referred to Mr. Anderson's race while giving directives); Beltre Aff. at ¶¶ 8-10, ECF No. 84-2 (Phoenix Delivery Truck driver, Juan Beltre, also confirmed that Mr. Cassano regularly referred to African Americans as "niggers," and that this behavior was common knowledge at Phoenix); Anderson Aff. ¶ 20, ECF No. 84-1 (Mr. Cassano called Mr. Anderson a "black bastard" and a "black son of a bitch," or words to that effect in 2007). It is incorrect as a matter of law to separate this evidence, from the admittedly less specific allegation of "racially derogatory remarks" ten days before Mr. Anderson's termination. *See Tomassi,* 478 F.3d at115 (at summary judgment, the court must view each fact in the light of all the evidence).

If one takes the allegation of Mr. Cassano's racially derogatory statement as true, the R&R's comparisons of the instant action's timeline to that of other cases becomes clearly distinguishable. *See, e.g., Muse v. New York City Dep't of Hous. Pres. & Dev*., 2000 WL 1209427, at *4 (E.D.N.Y. Aug. 22, 2000) (eight-month gap between firing and alleged discriminatory

6

statement); *Sethi v. Narod*, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014) (three-month gap between racial remarks and plaintiff's suspension); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (five-month gap).

### 3. A Jury Could Reasonably Find that the Racially Derogatory Comments Here Were Sufficiently Related to Phoenix's Termination Decision

Third, the R&R erroneously concluded that no reasonable jury could find that the derogatory comments were sufficiently related to the termination decision. Yet, just ten days after Mr. Cassano used a racially derogatory remark to Mr. Anderson, Mr. Ruiz told him, "I am going to get rid of you one of these days." *See supra* at 4. While Mr. Ruiz may not have used any racially derogatory language himself, he certainly expressed his disinterest in addressing the usage of such language at Phoenix, and he expressed an opinion about how he would like to respond: by terminating Mr. Anderson. He seals Mr. Anderson's fate ten days later, after discussing Mr. Anderson with Mr. Crowley and the rest of the executive team. *See supra* at 4. The R&R usurps the jury's function by not accounting for the reasonable narrative that, after years in a racially charged environment, little needed to be said because much was already understood. *See* R&R at 37. Perhaps the jury would reject that narrative, but it is surely entitled to consider it and this record supports it.

In addition to Mr. Ruiz's stated desire to get Mr. Anderson fired, if not due to racial bias, then at the very least for complaining about racial comments, there is evidence that the official decision makers relied heavily on Mr. Ruiz to reach termination decisions. Mr. Ruiz discussed Mr. Anderson with Mr. Crowley immediately before Mr. Anderson was fired (Ruiz Dep. at 123:24-124:7, ECF No. 81-11). In addition, Mr. Crowley held Mr. Ruiz in high regard (Crowley Dep. at 30:9, ECF No. 81-6 (stating, "I hired Oscar, he did a good job. I think I hit a home run.")). Finally, Mr. Crowley relied heavily upon Mr. Ruiz's input when making termination decisions

7

(Crowley Dep. at 33:15-21, ECF No. 81-6 "Q. Were other employees fired for not being good? A. I can't recall. I didn't have too many direct reports. I had a vice president and I had the director of operations reporting to me. I had a bigger picture to worry about."). As *Vance* states, in circumstances such as those found here, where the power to hire and fire is placed in the hands of a few, such that decision makers must rely on other workers who actually interact with the affected employee, an employer will not escape liability because it could "be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." 570 U.S. at ___, 133 S. Ct. at 2452.

Mr. Ruiz minimized his influence, claiming that he lacked the technical authority to fire shop stewards such as Mr. Anderson. Ruiz Dep. at 123:9-13, ECF No. 81-11. A reasonable jury, however, could conclude that Mr. Ruiz had *de facto* authority to fire Mr. Anderson, or at the very least, that Mr. Ruiz materially affected the decision to fire Mr. Anderson. *See* Crowley Dep. at 80:4-21, ECF No. 81-6 ("Oscar [Ruiz] handled it, and all I know is that Anderson got involved in some kind of a work stoppage and was fired.") Moreover, they would be well entitled to infer that the racial animus expressed towards Mr. Anderson was a motivating factor in the decision to fire him. *See Holcomb*, 521 F.3d at 142 (finding that a "more subtle racial motive" may have moved a middle manager with arguable input in the decision to terminate).

This case is not properly analyzed as one involving stray remarks. This record presents a notable stronger record of discrimination than many of those cited in the R&R. *See, e.g., McAllister v. Price Rite*, 2013 WL 5187036, at *8 (D. Conn. Sept. 13, 2013) (granting summary judgment where plaintiff was fired for failing to 'punch out' during his breaks, and declining to find that a single comment a month before termination by a non-decisionmaker that "you people have no logic" had evinced circumstances that could lead a reasonable jury to infer a racially discriminatory motive to terminate)*; Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356

8

F. Supp. 2d 248, 259 (E.D.N.Y. 2005) (granting summary judgment where plaintiffs, a married interracial couple, repeatedly brought arguments about the wife's interoffice sexual affair into the workplace, finding that non-decisionmaker's calling plaintiff a "white bitch" occurred solely within that context and did not show racial animus impacted decision to fire).  This is a not a case of isolated conduct.  Here, years of racial animus came to a head in a racially motivated termination.  A jury should decide what was in the minds of the relevant actors, which is very much open to more than one reasonable narrative.

### B. The R&R Errs in Finding that No Reasonable Jury Could Find That The Alleged Work Stoppage Was Pretext for Mr. Anderson's Termination

A reasonable jury could find that the allegation of a work stoppage was merely a pretext to cover for Mr. Anderson's racially motivated termination.  "To defeat an employer's motion for summary judgment at this stage, therefore, the plaintiff must demonstrate that there is a material issue of fact as to whether (i) the employer's asserted reason for discharge is false or unworthy of belief, and (ii) it is more likely than not that plaintiff's race was the real reason for the discharge."  *Rommage v. MTA Long Island Rail Rd.*, 2010 WL 4038754 at *8 (E.D.N.Y. Sept. 30, 2010) 452 F. App'x 70 (2d Cir. 2012) (*aff'd* on different grounds).  In this case, the jury would have to weigh Mr. Anderson's evidence of discriminatory animus against Phoenix's evidence that he was fired on account of the alleged work stoppage and not because of animus.  *See Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 115 (2d. Cir. 2002) ("Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive.").

### 1. The Record Supports a Reasonable Finding that the Alleged Work Stoppage Was Pre-Text for Firing Mr. Anderson

By taking the evidence of discriminatory animus out of context and diminishing its force, the R&R incorrectly puts a thumb on the scales. Failing to consider the reasonable narrative Mr. Anderson offers, based on the record, leads the R&R to argue that his *prima facie* evidence of unlawful firing is weaker than it really is, corrupting the analysis of pretext. While the alleged work stoppage gave Phoenix an excuse to fire Mr. Anderson, a reasonable jury could find that Phoenix truly fired its long-standing, productive employee, Mr. Anderson, because of its employees' racial animus towards Mr. Anderson, and because of his repeated complaints about the animus he faced (which are protected activities under Title VII).

A reasonable jury could find that Phoenix would not have pursued the termination had Mr. Ruiz not intended to "get rid of" Mr. Anderson. In addition to the facts already spotlighted, a reasonable jury could also rely upon the following facts, among others, including those that support Mr. Anderson's hostile work environment claim, to find that the "work stoppage" was a mere pretext for Mr. Anderson's termination, and that Phoenix pursued it for illicit reasons:

- Mr. Anderson's being interrupted at dinner and returning from home to the warehouse on the night of the work stoppage to deal with Mitchell Guttman, a supervisor known for making racially derogatory remarks, including calling Mr. Anderson "Boy" on March 17, 2008, and for smoking on the premises, s*ee* Anderson Aff. ¶¶ 38-39, ECF No. 84-1;

- Phoenix employee Melanio Torres stated that Mr. Anderson did not initiate any work stoppage, which would have been impossible since work had not yet started, but rather that employees came of their own volition to Mr. Anderson to voice various complaints. Arbitrator's Award and Op. Dated March 3, 2009 ("Anderson Arb. Op.") at 12, ECF No. 84-9.

- Another employee, Socrates Lopez largely confirmed that no work was ongoing when the employees met, and that the employees approached Mr. Anderson, not the other way around. See Anderson Arb. Op at 13, ECF No. 84-9.

- No work went uncompleted, Phoenix paid no overtime, and it lost no money, s*ee* Anderson Aff. ¶ 51, ECF No. 84-1; Anderson Arb. Op. at 9, n. 5, ECF No. 84-9.

10

- At the time, the termination was unprecedented, as witnesses could not name a single instance in which Phoenix had terminated an employee for such a short alleged work stoppage. Crowley Dep. 83:8-13, ECF No. 81-6; Srgo Interog. 27(g) at 11, ECF No. 81-12.

- subsequently, Phoenix did fire two employees for a work stoppage, but those were both distinguishable:

    - In *Rodriguez*, the actions of the complainant cost Phoenix $20,000 in revenue as well as significant good will due to missed deliveries. *See* Arbitrator's Award and Opinion Dated October 1, 2010 at 7, n. 4, ECF No. 81-14.
    - In *Hogan*, the complainant coordinated with media to publicize his grievances. *See* Arbitrator's Award and Opinion Dated October 25, 2010 at 7, ECF No. 81-15.

- Phoenix chose not to fire Mr. Guttman after Mr. Ruiz confirmed Mr. Guttman called the 50-year-old Mr. Anderson "boy," *see supra* at 3—an offense for which most employers would fire the perpetrator.

- Phoenix did not fire Mr. Cassano for his repeated use of racially derogatory language, which was well known amongst supervisors and employees, alike, or even after Mr. Anderson complained of such language to Mr. Ruiz (Anderson Aff. ¶ 37, ECF No. 84-1)—again, an offense for which most employers would fire the perpetrator.

- Anthony Leone, another supervisor with management responsibilities frequently used the words "Nigger" and "Boy" in the warehouse, Anderson Aff. ¶¶ 21-22, ECF No. 84-1—once again, an offense for which most employers would fire the perpetrators.

- Phoenix promoted employees known to use racially derogatory language. Anderson Aff. at ¶¶ 17-18, ECF No. 84-1.

- Phoenix's failure to properly train supervisors regarding racial discrimination. *See* Plaintiff Walter L. Anderson's Memorandum Of Law In Opposition To Defendant's Motion For Summary Judgment ("Memo. in Opp.") at 6-7, ECF No. 82.

- Phoenix's failure to mitigate the hostile work environment. Memo. In Opp. at 17-18, ECF No. 82.

- Other supervisors, including Charles Carter, Al Rivera, and Lee Battle, openly tolerated the use of racially charged language in the warehouse. Perdue Dep. at 63:1-23, ECF No. 81-10.

11

- Mr. Cassano ordered Mr. Anderson, but not any white employees with Mr. Anderson's responsibilities, Anderson Aff. ¶ 19, ECF No. 84-1 to complete janitorial tasks outside the scope of his employment as a forklift operator. Cassano Dep. at 74-75, ECF No. 81-5.

- While some of the facts above are disputed, all must be considered true, and inferences need to be drawn in Mr. Anderson's favor. Fed. R. Civ. Proc. 56; *Reeves*, 530 U.S. at 150. From these facts, a reasonably jury could conclude racial animus noticed the termination.

### 2. The R&R Errs in Giving the Arbitration Decision Great Weight

In finding that the causal link between his termination and racially discriminatory motives is too attenuated, the R&R gives great weight to the Arbitration Decision ("AD") on the cause of Mr. Anderson's termination. While the AD concludes that Phoenix had a legitimate basis for terminating Mr. Anderson, it failed to address whether Phoenix would have pursued this termination absent potential racial animus. There are at least two reasons for this failure: 1) the AD's record lacked the evidence found and presented here regarding the racial animus Mr. Anderson suffered; and 2) such a question—would have Phoenix pursued this arbitration absent racial animus—was beyond its purview. The failures to hear evidence and render a determination regarding the key issue in this case compromise the AD and limit its value here.

*Collins* does not ask whose responsibility it is to present the evidence. It only asks if the evidence was presented and suggests that a negative arbitration decision based on substantial evidence will attenuate a plaintiff's Title VII claim unless "new evidence not before the tribunal" is presented. *Collins*, 305 F.3d at 119. Further, *Collins* stresses that the "determination of how much weight to give a particular arbitration decision is left to the court's discretion and depends on the facts and circumstances of each case." *Id.* Here, the Court should not find the AD to be "substantial evidence" that would attenuate Mr. Anderson's claim, because evidence of racial animus was never presented during the arbitration. Instead, the only evidence presented went

12

solely to the issue of whether a work stoppage occurred, and whether that justified Mr. Anderson's termination. *See* Anderson Aff. ¶¶ 36, 49, ECF No. 84-1.

Further, here, there is documentary evidence that supports Mr. Anderson's statement that he was told he could not raise his claims of discrimination in this arbitration. *See* Anderson Aff. ¶¶ 36, 49; ECF No. 84-1. Before the arbitration, Mr. Anderson was advised on two separate occasions that Phoenix policy only permitted one grievance to be heard at a time. *See* Anderson Aff. ¶¶ 36, 49, ECF No. 84-1. Documents from the Union that represented Mr. Anderson support his claim that Mr. Anderson wanted his discrimination claims to be included in the arbitration, but the Union had told him about Phoenix's alleged policy. See Anderson Supplemental Decl. Dated April 5, 2017, Exh. A (entitled "Statement of Teamsters Local 812 Position re Case Number 29-CB-14074") at 1, ECF 102-2 (stating "At that time, in October 2007, arbitration demands were made by Local 812 upon the Company, who specified that it only heard (1) grievance at a time")[2]; Crotty Letter to J. Tiscione Dated April 25, 2017, Exh. 1 at 000245, ECF No. 106-1, (referring to "[Phoenix's] position that only one arbitration hearing will be scheduled for any one day). To the extent that the R&R dismisses this statement and the supporting document, *see* R&R at 43 n.18, it resolves a material issue of disputed fact regarding the policy and its effect on Mr. Anderson's presentation of evidence at the arbitration.

Finally, the evidence developed in this lawsuit could not realistically have developed in the truncated arbitration process. The arbitration process focused on the narrow issue of whether there was a work stoppage. *See* Anderson Aff. ¶ 51, ECF No. 84-1. The arbitration hearing developed evidence relating to the timeframe and nature of Mr. Anderson's site visit in response to complaints Mr. Anderson received about uneven distribution of work and non-compliance with smoking

---

[2] Although this version lacked bates stamped, this document has been produced variously as P000711-P000714, and 000191-000194, as represented in Martin Decl. Dated April 27, 2017, ECF No. 107-1.

13

policies. Anderson Arb. Op. at 15-16, ECF No. 13-2. The situation illustrates why more formal adjudication systems, like courts, have complex procedural mechanisms to develop and distinguish types of claims. Arbitration is less formal by design, so its reach is more limited.

The R&R also finds *Rommage,* 2010 WL 4038754, persuasive here, particularly on the issue of discrimination evidence not being raised at the arbitration, R&R at 44. However, the R&R fails to account for the factual gulf between the cases. In *Rommage*, the plaintiff had an extensive and serious disciplinary record that undermined her pretext claim. 2010 WL 4038754. at *2. Mr. Anderson was a long-term employee who was elected shop steward in 2002. *See* Anderson Aff. ¶ 2, ECF No. 84-1. He also received regular salary increases over the sixteen-year period of his employment with Phoenix and had no significant history of discipline. *See* Anderson Aff. ¶¶ 1, 4, ECF No. 84-1. *Rommage* also presents an employer who had a strong, well-functioning anti-discrimination training system—unlike Phoenix, *see* Cassano Dep. at ¶¶ 20-21, ECF No. 81-5; Leone Dep. at ¶ 20, ECF No. 81-9; Guttman Dep. ¶¶ 29-30, ECF No. 81-8. Contrary to the *Rommage* employer, Phoenix ignored a problem it knew about, fostering a workplace environment conducive to racial hostility.

The R&R also frets that it would create a "perverse incentive" to allow Mr. Anderson to decline to raise evidence of racial animus during arbitration in order to later rebut that arbitration decision. First, no such gamesmanship occurred here. As detailed above, *see supra* at 12-13, Mr. Anderson wanted to include his discrimination allegations in the arbitration, but was told those claims had to be brought separately—a fact the R&R overlooks when discussing incentives. *See* R&R at 45. As a result, no perverse incentive would be encouraged on these facts. Second, there is no real chance that such incentives will occur in the future. This is a case with severely limited precedential effect, as the arbitration clause at issue here is antiquated. After the Supreme Court decision in *14 Penn Plaza LLC v. Pyett*, in April 2009 (and even before), employers (like Phoenix,

14

*see* [ECF No. 13-3 (excerpts from the revised Collective Bargaining Agreement ("CBA")); Memo. in Opp. at 1 (discussing Phoenix's revision of its CBA)]) changed their CBAs to include unambiguous language that would require all claims of racial discrimination to be arbitrated. 556 U.S. 247. *Collins* and its progeny are fading into the rearview mirror, because post-2008 factual scenarios will not raise the *Collins* issue being debated here. Thus, whatever incentives may be theorized, the R&R would impose an erroneous legal standard to solve a problem that no longer exists to the detriment of Mr. Anderson's legal rights.

There is more than enough record evidence of the causal link between the termination and the racially discriminatory motive to raise a question of fact as to whether the final termination decision by the arbitrator dispositively weighs against a finding of discriminatory motive. A reasonable jury could conclude the alleged work stoppage was a mere pretext for race discrimination.

## II. A Reasonable Jury Could Find that Retaliation Was the "But-For" Cause of Mr. Anderson's Termination

The R&R states that the AD, if the Court affords it any weight, makes it impossible for Mr. Anderson to prove "but-for" causation. R&R at 48 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 133 S.Ct. 2517, 2533 (2013)). This is not correct. The retaliatory motive must be a "but-for" cause under *Nassar*, but the R&R goes too far in saying that the AD precludes a reasonable jury from finding "but-for" causation in this case. The AD, if given weight, at best shows that Phoenix had grounds to terminate Mr. Anderson. It does not conclusively show, as the R&R implies, that Phoenix *would have* chosen to terminate Mr. Anderson, regardless of Mr. Ruiz's stated desire to rid himself of an employee who had complained on multiple occasions of racial hostility.

15

As the R&R suggests, "but-for" causation does not require proof that retaliation was the only cause for Mr. Anderson's termination, but only that Mr. Anderson would not have been terminated absent the retaliatory motive. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Indeed, the Second Circuit has noted there can be multiple "but-for" causes of an adverse employment action, and that such an analysis in the context of retaliation is particularly ill-suited for summary judgment. *See id.* at 737 F.3d 846, n.5. While the AD finds that the firing was legitimate, this is not the end of the inquiry. Just because there was a basis for firing does not mean no reasonable jury could find retaliation was the "but-for" cause.

Mr. Anderson's view, and he should be allowed to present it to a jury, is that an at-best short work stoppage that resulted in all work being completed without overtime costs would have never resulted in Mr. Anderson's termination had he not complained as vigorously as he did about the discriminatory and hostile treatment to which he was subject. A reasonable jury could find that this theory has support in the record:

- Mr. Ruiz's threat to terminate Mr. Anderson just ten days before the termination. Anderson Aff. ¶ 37, ECF No. 84-1.

- the fact that Phoenix did not fire Mr. Guttman, Mr. Leone, or Mr. Cassano for multiple instances of undisputedly racist remarks, despite multiple complaints by Mr. Anderson. Memo. in Opp. at 5-6, ECF No. 82.

- the lack of any monetary loss as a result of the alleged work stoppage. Anderson Arb. Op. at 9, n. 5, ECF No. 84-9.

- Mr. Anderson's otherwise good worker record. Cassano Dep. at 108, ECF No. 81-5.

- Mr. Ruiz's involvement in the decision making process for Anderson's termination. *See supra* at 4.

- Defendant witnesses have been unable to point to a single instance in which a Phoenix employee was terminated for holding a work stoppage. Crowley Dep. 83:8-13, ECF No. 81-6; Srgo Interog. 27(g) at 11, ECF No. 81-12.

- *See supra* at 10-11.

16

These facts support a finding that, "but-for" a retaliatory motive, this termination would not have occurred.

## Conclusion

For these reasons, the Court should deny Defendant's motion for summary judgment in its entirety.

Date:   New York, New York
        July 31, 2017

                                                  Respectfully submitted,

/s/ Michael W. Martin
Michael W. Martin, Esq.
Ian Weinstein, Esq.
Lincoln Square Legal Services, Inc.
150 W. 62nd Street, 9th Floor
New York, NY 10023
(212) 636-6934
*Attorneys for Plaintiff*